RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOHN GEORGE,

       *Plaintiff-Appellant*,

    *v.*

YOUNGSTOWN STATE UNIVERSITY; JAMES P. TRESSEL;
MARTIN A. ABRAHAM; GREGG STURRUS,

       *Defendants-Appellees*.

No. 19-3581

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:17-cv-02322—Benita Y. Pearson, District Judge.

Argued: March 11, 2020

Decided and Filed: July 17, 2020

Before: CLAY, ROGERS, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** James B. Lieber, LIEBER, HAMMER, HUBER, & PAUL, P.C., Pittsburgh, Pennsylvania, for Appellant. Drew C. Piersall, ZASHIN & RICH CO., L.P.A., Columbus, Ohio, for Appellees. **ON BRIEF:** James B. Lieber, Thomas M. Huber, LIEBER, HAMMER, HUBER, & PAUL, P.C., Pittsburgh, Pennsylvania, for Appellant. Drew C. Piersall, ZASHIN & RICH CO., L.P.A., Columbus, Ohio, for Appellees. Drew C. Piersall, ZASHIN & RICH CO., L.P.A., Columbus, Ohio, for Appellees.

    CLAY, J., delivered the opinion of the court in which GRIFFIN, J., joined, and ROGERS, J., joined in part. ROGERS, J. (pp. 31–36), delivered a separate opinion concurring in part and dissenting in part.

—————————————

**OPINION**

—————————————

CLAY, Circuit Judge.   Plaintiff John George, a former professor at Youngstown State University ("YSU"), appeals the district court's grant of summary judgment for Defendants in his employment discrimination and retaliation lawsuit, which he brought under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.   After he was previously denied tenure, George filed a discrimination lawsuit against YSU and was reinstated as part of a settlement agreement.   But as soon as the university's obligations under the agreement expired, it declined to renew George's contract and terminated his employment.   George also applied to several other positions within the university but was rejected.   He then again filed suit in federal court.

Following discovery, the district court granted summary judgment in favor of YSU on George's claims, ruling that for each of them, George either failed to show causation, failed to show he was qualified for the job, or failed to show that YSU's claimed reasons for firing (or not hiring) him were pretextual.   The court also dismissed one of George's failure-to-hire claims— which arose after this lawsuit was filed—based on an administrative exhaustion requirement. But viewing the evidence in the light most favorable to George reveals a genuine dispute of material fact as to each of the claims he maintains on appeal, and the district court further erred in enforcing the administrative exhaustion requirement because Defendants expressly waived it below.   Accordingly, we reverse the district court's grant of summary judgment and remand this case for trial.

**BACKGROUND**

**A.  George's Career at YSU and His First Discrimination Lawsuit**

John George is a sixty-nine-year-old man with a background in engineering.   In the 1970s, George received a Bachelor of Science degree in mathematics (with a physics minor), a Bachelor of Engineering degree in mechanical engineering, and a Master of Science degree in education with a focus on mathematics, all from Youngstown State University.   He was also

licensed by Ohio to teach grade 7–12 mathematics and physics, but instead worked in engineering-related jobs in the private sector for twenty years.

In 1999, YSU's School of Engineering Technology hired George as an instructor on a one-year term contract, but George then applied for and was hired as a tenure-track assistant professor. A little over five years later, and after obtaining his Professional Engineer license, George applied for tenure. George was supported by the chair of the School of Engineering Technology and a majority of the faculty, but the dean of the College of Engineering and Technology—Cynthia Hirtzel—opposed his application, which was denied by the president of YSU, David Sweet. A three-member tenure appeal committee was formed, which unanimously recommended that George be awarded tenure. But Sweet rejected this recommendation and stuck to his denial of tenure.

Soon after this denial, George says he learned that "this faculty position was one of several earmarked to be filled by minorities only." (George Decl., R. 50-1 at PageID #4600.) According to George, Hirtzel favored a younger African American man for the position, who happened to have been George's former undergraduate student. On December 13, 2006, George filed suit in federal court under both Title VII of the Civil Rights Act and Ohio law for race, sex, and age discrimination.

At around the same time as George's lawsuit, Hirtzel was demoted from her position as dean. A new College of STEM (meaning Science, Technology, Engineering, and Mathematics) was created in place of the College of Engineering and Technology, and Martin Abraham was installed as its dean.

In February 2008, George settled his lawsuit against YSU. Under the settlement agreement, George was reinstated as an assistant professor under a term contract, but could not be fired without "just cause" until the end of the 2011–2012 academic year. (Settlement Agreement, R. 48-3 at PageID #3686.) Even after that, if YSU declined to renew George's contract, it was required to provide George with group medical insurance until he became eligible for Medicare.

**B. YSU Does Not Renew George's Term Contract**

In August 2008, George returned to YSU and resumed teaching. But even with (or perhaps as a result of) his settlement, George says he was excluded from participation on faculty search committees and was denied his preferred course assignments. Nevertheless, George continued his work and taught general mathematics and physics classes, along with other introductory courses in engineering technology. George also pursued a Doctor of Education at YSU, which he was awarded in 2013. His thesis was on preparing math-deficient students for success in university STEM courses. During this time, George claims he received positive reviews on his work, both from Dean Abraham and the chair of his department, Carol Lamb.

While George's mandatory reinstatement ended in Spring 2012, YSU continued to renew his employment until Spring 2015, at which point Abraham had been promoted to provost and Gregg Sturrus (the former chair of George's tenure appeal committee) was made interim dean of the STEM college. Abraham was aware of George's prior lawsuit because he was tasked with administering the settlement agreement.

At some point after their promotions, Abraham told Sturrus that "whatever years of [George's] reinstatement there were, were finished." (Sturrus Dep., R. 42 at PageID #2895.) Additionally, the two of them discussed the fact that the college was facing budget cuts and so would be "losing term positions," meaning term employees like George. (*Id.* at #2895–96.) During the discussion, George specifically was mentioned, though other term employees were not. (*Id.* at #2896.)

In April 2015, George became eligible for Medicare when he turned sixty-five, and therefore YSU was no longer obligated to provide him with medical benefits if they declined to renew his contract. And two weeks later, on April 20, 2015, George was terminated from his position as an assistant professor. George's department chair, Carol Lamb, told him that his contract would not be renewed, and said that Gregg Sturrus (the acting dean) thought he should know. She also said George's firing was "a Martin Abraham decision." (George Decl., R. 50-1 at PageID #4612.) While George stayed on as an adjunct to teach two intro-level classes, this came with the loss of most of his pay and all of his benefits.

In addition to the discussion of his prior settlement and the timing of his Medicare eligibility, George says there are other reasons to believe his firing was retaliatory, or at least that YSU's claimed reason of budget cuts was pretextual. First, George says that Abraham repeatedly tried to shift the blame for George's firing. In an affidavit submitted to the EEOC, Abraham said that both he and Sturrus jointly determined "that the School of Engineering Technology could not sustain Dr. George's position and salary in light of budgetary concerns." (Abraham Aff., R. 48-13 at PageID #3787.) But at his deposition, Sturrus denied this, said he had recommended that George's contract be renewed, and that the decision to fire him was Abraham's alone. At his own deposition, Abraham then appeared to say that Carol Lamb— George's department chair—made the decision to terminate him, and that Abraham merely approved it. But Lamb said she was never consulted about George's firing, and only found out about the decision after the fact.

Second, George disputes YSU's claimed budgetary need to fire him. While Abraham said that George's termination was necessitated by the return of another professor from a period of unpaid leave, George points to evidence suggesting that other term instructors had been covering that professor's courses, and that George's area of teaching did not overlap with that of the returning professor. One of those other term professors told George that "he was really concerned about his position" if the professor on leave returned, but that professor was renewed and George was let go. (George Decl., R. 50-1 at PageID #4616.) Of the term faculty members in his department, all (including George) were recommended for renewal, but George was the only one who was terminated. The college also had several faculty retirements and stable enrollment.[1]

---

[1]Defendants note that a memorandum from Sturrus to Abraham, dated April 9, 2015, said that there were six renewal requests (including George), and that "[a] scrutiny by the chairs in STEM questioned only one of the renewals (George)." (Renewal Mem., R. 48-8 at PageID #3740.) But the memo also said that "[a] discussion followed [this scrutiny,] resulting in the recommendation to forward all the renewal requests." (*Id.*) According to Sturrus, this "questioning" was based on the fact that George's courses were not part of a degree program, and Abraham never followed up with Sturrus about the "scrutiny" or whatever concerns the chairs might have raised. (Sturrus Dep., R. 42 at PageID #2924–26.)

**C. YSU Refuses to Hire George for Other Positions**

Despite the nonrenewal of his contract, George continued to apply for teaching and administrative jobs at YSU. In the summer of 2015, George applied to be the Director of Dual Enrollment and Student Support Services in the math department. But instead of George, YSU hired Julie Seitz, a woman in her forties. According to Defendants, this was because George was not qualified for the position, which required a master's degree in mathematics. George maintains that he was qualified for the job based on his other credentials, including his bachelor's degree in math, his master's degree and doctorate in education (with the first having a concentration in mathematics), and his mathematics teaching license.

The chair of the three-person search committee said that they did not consider George because he lacked a master's degree in math, regardless of his other qualifications. Two members of the search committee said this was because without a master's in mathematics, whoever became the director would have a lower level of math education than that of the teachers she would be supervising. The third committee member did not speculate as to a reason for the requirement, but in any event maintained that it was set in stone.

For his part, George points to deposition testimony and statements in an affidavit suggesting that YSU generally considered equivalent alternatives in lieu of any listed educational requirements. (*See* Shields Decl., R. 50-2 at PageID #4640 ("[W]e have always considered 'equivalencies' rather than 'strict requirements' . . . ."); *cf.* Goldthwait Dep., R. 38 at PageID #1991 (describing George's credentials as "more than equivalent" to a bachelor's degree in mathematics education); *id.* at #2002–03 (looking to courses taken by an MBA recipient to see if they were equivalent to a master's in math).) He also notes that a member of the search committee—Richard Goldthwait—asked if George could be considered even without the master's degree in math but was shot down by the department chair.

While YSU points to George's lack of a master's in mathematics as the legitimate, nondiscriminatory reason Seitz was hired for the job, George argues this was merely a pretext for

age discrimination.**²**  George claims that Goldthwait and possibly another faculty member told him that Seitz had been preselected for the job, allowing for an inference of pretext.

George also notes that when Seitz initially applied for the job, she had not yet received her master's degree, and so YSU changed the job posting to cover anyone who would receive that degree by the same time as Seitz.  (*See* Revised Job Posting, R. 48-19 at PageID #3874 ("Master's degree in mathematics to be received by August 31, 2015."); Call Notes, R. 48-20 at PageID #3914 (noting that the "candidate chosen does not currently have the req[ired] masters [and the] posting does not state" that "in progress" was acceptable, with the two options being "(a) keep reviewing applicants [and] monitor posting [or] (b) [make a] new posting [and] allow for master's in progress").)  Additionally, search committee member Lori Carlson told Goldthwait that, if asked at his deposition whether he told George that Seitz had been preselected, he should say no, even though Goldthwait could not recall this one way or the other. George says this suggests a coverup, making it more likely that YSU's stated reason for not hiring him was pretextual.

In January 2016, George filed claims for age discrimination and retaliation with the federal Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission.  The EEOC considered George's administrative charge throughout 2016 and into 2017.

In November 2016 and while the EEOC charge was pending, George applied to become an Assistant Director of Research Services in YSU's Office of Research.  The office was headed by Mike Hripko, who reported directly to and was "very close" to Abraham.  (George Decl., R. 50-1 at PageID #4634.)  Hripko told Abraham that George had applied for the position, and Abraham needed to sign off on the hiring process.

According to Hripko, about fifteen people applied for the position, but the five-member search committee narrowed this to four, who were then invited to interview via video calls.

---

**²**In the district court, George also argued that this failure to hire was retaliation for his 2006 lawsuit and gender discrimination in favor of women, but he has abandoned these claims on appeal.  *See, e.g.*, *Burgess v. Fischer*, 735 F.3d 462, 477 n.2 (6th Cir. 2013) (noting that claims raised in the district court but not briefed on appeal are abandoned); *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004) (same).

While Hripko was not a member of the search committee, he participated in one of the video interviews: George's. Hripko says this is because the chair of the search committee had a family emergency, and so Hripko stepped in to participate in the interview "as an observer." (Hripko Decl., R. 45-2 at PageID #3613.)

Hripko claims that George was "not impressive" in his video interview, and specifically that "it was apparent to [Hripko] that Dr. George was not familiar with electronic research administration," a key part of the position. (*Id.*) The search committee instead invited two applicants back for in-person interviews, including the one who got the job: Ashley Riggleman, who was thirty-four years old. Hripko says he hired Riggleman in part because of her electronic research experience and specifically her familiarity with software called "Moderas," which YSU had purchased just one month before she was hired.

George claims this was pretext, either for age discrimination or retaliation for filing the EEOC charge. As evidence of pretext, George disputes that his interview went poorly, and says that at least one interviewer told Hripko that Riggleman was immature. George notes that Moderas was never mentioned in the search qualifications for the job, says he could easily have mastered the program within weeks, and argues that the Moderas question is a red herring, since Moderas went bankrupt and the software was never implemented at YSU.

George also points to irregularities in the search process, which could further suggest pretext. For example, on an internal form, YSU listed reasons why each candidate was not selected, including by identifying why Riggleman had greater experience. Even though the form says that the hiring team "must identify" this greater experience for candidates whose lesser experience was noted as a basis for rejection, George's entry on the form is the only one that fails to discuss his experience or compare it to Riggleman's. George also claims that Riggleman met both Hripko and the chair of the search committee in Utah before the hiring process began, and then applied for the job within twenty-four hours of its being posted, suggesting an inside track.

On August 9, 2017, the EEOC issued George a right-to-sue notice, allowing him to pursue his claims in federal court.  And on November 6, 2017, George filed this lawsuit, naming YSU, its new president James Tressel, Abraham, and Sturrus as defendants.

Three days later, YSU posted a vacancy for Lecturer in the School of Technology, and specifically for "First Year Engineering Technology" courses.  According to George, these courses included the introductory level class he previously developed and taught, as well as some of George's other former classes.  The new dean of the STEM college—Wim Steelant—said that Abraham told him the position was similar to George's old job at YSU.

George applied for the lecturer job on November 15, 2017.  Abraham became aware of George's lawsuit at approximately the same time.  Although he admits that George was qualified for this position, Abraham, "in consultation with the Dean and the chair of the department," terminated the search without filling the post.  (Abraham Dep, R. 35 at PageID #568–69, #579–81.)  Steelant testified that Abraham said "there might be an issue because a person by the name of John George applied to this position," and that Abraham was "seeking information with legal on what to do next."  (Steelant Dep., R. 49-7 at PageID #4460.)  Abraham also later mentioned that "someone applied to [the job] that [previously] held the position . . . and is now applying again to it."  (*Id.* at #4471.)

An email from Steelant to Abraham also discusses the position and connects the vacancy to George's application:

> Here is a recap.  The School of Technology was approved for a lecturer position. *However, the issue came about with John George*.  I suggested not to do anything with this position due to budgetary reasons and repost in August–September as a tenure-track position with hire Fall 2019.  At least this is how I remembered our conversation.

(YSU Emails, R. 48-14 at PageID #3790 (emphasis added).)  At this point, Steelant believes the position is still open, but "due to the complexity, that's now with legal."  (Steelant Dep., R. 49-7 at PageID #4463.)

According to Abraham, the decision to abandon the search was made through the academic affairs division because YSU "needed the budget line to support a different position."

(Abraham Dep., R. 35 at PageID #579.)  This other position was a lab coordinator for the School of Engineering Technology, which Abraham said was important for the school's accreditation. But another professor testified that this was only a suggestion, and even without this position, YSU received full accreditation, and the university has taken no steps to fill the lab coordinator job.  George argues that these facts suggest retaliatory intent in refusing to hire him for the lecturer position, and also amount to further evidence that YSU's other failures to hire him were pretextual.

While George never filed an administrative charge in connection with the lecturer position, Defendants agreed to waive the administrative exhaustion requirement on this claim so that the district court could "proceed to a ruling on the merits," citing case law allowing for such a waiver.  (Reconsideration Opp'n, R. 63 at PageID #4865–66; *see also id.* at #4866 ("If the Court is so inclined, Defendants would not oppose 'waiving' Plaintiff's administrative exhaustion requirement, as provided for in *Zipes*, and proceed to a ruling on the merits." (citing *Zipes v. TWA*, 455 U.S. 385, 393 (1982))).)  George accepted this offer and also asked the district court to decide his claim on the merits.

### D.  The District Court's Summary Judgment Order

After discovery, Defendants moved for summary judgment on all of George's claims. For George's termination claim, Defendants argued that he failed to show a causal connection between his previous antidiscrimination suit and his eventual termination, and alternatively could not show that YSU's asserted reason for firing him was pretextual.  Defendants also argued that George was not qualified to be the Director of Dual Enrollment and Student Support Services, his poor interview performance was the reason he was not hired as Assistant Director for Research Services, and that the lecturer job in the School of Technology was never filled, meaning George cannot state a prima facie case.

The district court largely agreed with Defendants and granted them summary judgment in full.  *George v. Youngstown State Univ.* (*George I*), No. 4:17-CV-2322, 2019 WL 118601 (N.D. Ohio Jan. 7, 2019), *modified in part*, 2019 WL 2330465 (N.D. Ohio May 31, 2019).   On George's termination claim, the court found that the extensive time between his 2006 lawsuit and

his 2015 termination foreclosed a finding of causation, since the three-year period between the end of his guaranteed renewal under the settlement agreement and his actual termination was "fatal to establishing a causal connection for retaliation." *Id.* at \*11–12. While George argued that the three-year gap can be explained by YSU's obligation to still pay for his health insurance if they fired him any earlier, the district court rejected this argument, as YSU still had the opportunity to terminate him despite this financial disincentive. *Id.* at \*12. Since this finding alone foreclosed George's claim, the district court never addressed whether George had put forward evidence showing that YSU's asserted reason for firing him was pretextual. *See id.* at \*11–12.

For George's failure-to-hire claim for Director of Dual Enrollment and Student Support Services, the court found that George met his prima facie burden in showing he was qualified for the position, as a reasonable juror could find that his educational credentials were equivalent to the required master's in mathematics. *Id.* at \*8. But even though Defendants had not moved on this basis, the court went on to assess whether George had put forward evidence showing that YSU's asserted reason for not hiring him—his lack of qualifications—was pretextual. *George I*, 2019 WL 118601, at \*8. The district court found that George's evidence failed to show that age was the real reason he was not hired, and so it granted summary judgment for Defendants. *Id.*

George's other failure-to-hire claims met a similar fate. For the Assistant Director for Research Services post, the court held that George's evidence could not show that YSU's asserted reason for not hiring him—his weak interview performance—was pretextual, foreclosing both his age discrimination and retaliation claims. *Id.* at \*10–11. The court also held that George failed to meet his prima facie burden of showing a causal connection between his non-hiring and his EEOC charge, *id.* at \*11, even though again, Defendants never moved for summary judgment on this basis. And for the lecturer job, the district court said that George failed to respond to summary judgment on this claim, and so had abandoned it. *George I*, 2019 WL 118601, at \*4 & n.3.

George then filed a motion for reconsideration, pointing out that he had not abandoned his failure-to-hire claim based on the lecturer position, and in fact had included it in his opposition to summary judgment. The district court agreed that its previous ruling was in error,

and so proceeded to address that claim again. *George v. Youngstown State Univ.* (*George II*), No. 4:17-CV-2322, 2019 WL 2330465, at \*2 (N.D. Ohio May 31, 2019). But rather than consider its merits, the court rejected this claim for George's failure to exhaust his administrative remedies before the EEOC. *Id.* at \*3–4. In its ruling, the district court recognized that "[t]he Sixth Circuit has held that the administrative exhaustion of a Title VII claim is not jurisdictional," and so is "subject to equitable doctrines, such as waiver." *Id.* at \*3. But the court said it did not need to actually permit such a waiver, and declined to do so. *Id.*[3]

George then appealed, arguing that the district court erred on each of the points discussed above that the court had resolved against him. In response, Defendants argue that the district court correctly ruled against George, and alternatively, that (1) George failed to show pretext with respect to his firing, (2) the district court was wrong in finding that George's educational credentials could be equivalent to a master's in math, and (3) George's claim on the lecturer job also fails because YSU never filled the position. All of these issues are now before this Court.

## DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *King v. United States*, 917 F.3d 409, 421 (6th Cir. 2019) (citing *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc)). A party is entitled to summary judgment if she shows "there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir.

---

[3]As support for its decision, the court noted that the Supreme Court had granted certiorari on the question of whether Title VII's administrative exhaustion requirement was jurisdictional, and thus could not be waived. *George II*, 2019 WL 2330465, at \*3 (citing *Fort Bend County v. Davis*, 139 S. Ct. 915 (2019) (mem.)). But the Supreme Court held that the requirement was a claim-processing rule, and not jurisdictional, maintaining this Court's existing case law. *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1850–52 (2019).

2016) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

The burden of demonstrating the absence of a genuine dispute of material fact first rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a "genuine issue" for trial via "specific facts." *Id.* at 324. Additionally, the moving party is entitled to summary judgment when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

When evaluating a motion for summary judgment, we must "view[] [the evidence] in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). This includes drawing "all justifiable inferences" in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jackson*, 814 F.3d at 775 (quoting *Anderson*, 477 U.S. at 249).

## B. Retaliatory Termination Claim

George's first ground for appeal is that the district court erred in granting summary judgment on his retaliatory firing claim. The court rejected this claim after finding that the extended time between George's 2006 lawsuit and his 2015 termination precluded any inference of causation. *George I*, 2019 WL 118601, at *11–12. Defendants say that the district court got this right, and that alternatively, George has failed to create a genuine issue of fact as to whether their asserted reason for firing him—YSU's budgetary constraints—was pretextual. For the reasons that follow, the district court erred in rejecting George's evidence of causation, and based on the evidence he presented, a reasonable juror could reject YSU's claimed reason for firing George as pretext. Accordingly, we reverse the district court's grant of summary judgment on this claim.

George attempts to prove discrimination and retaliation through circumstantial evidence, and so his claims are analyzed under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–07 (1973). Under that framework, George carries the initial burden of establishing a prima facie case of discrimination or retaliation. *Id.* at 802; *accord Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If George can do so, the burden then shifts to Defendants, who must "articulate some legitimate, non-discriminatory reason for [their] actions." *Laster*, 746 F.3d at 730 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). But even if Defendants do articulate such a reason, George can still win by "demonstrate[ing] that Defendants' proffered reason was not the true reason for the employment decision," which would suggest that it was merely a pretext for discrimination. *Id.*; *accord McDonnell Douglas*, 411 U.S. at 804–05.

Because the district court rejected George's termination claim at the first step of the *McDonnell Douglas* framework—his prima facie case—we begin there.

### 1. Prima Facie Case

In order to establish a prima facie case of retaliation under Title VII, 42 U.S.C. § 2000e-3(a), George must show that "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). Defendants agree that George carried his burden on the first three prongs, but say that his evidence cannot show a causal connection between any protected activity and his termination as an assistant professor.

To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a "but for" cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013). In other words, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the

adverse action would not have been taken had the plaintiff not filed a discrimination action" or otherwise engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). At the prima facie stage, this burden "is not onerous," and can be met through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.*

In several cases, this Court has addressed the relationship between temporal proximity and a plaintiff's prima facie showing of causation. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *accord, e.g.*, *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 615 (6th Cir. 2019). In such cases, the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected activity. *See, e.g.*, *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 506 (6th Cir. 2014) (firing occurred the day after protected activity); *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 446–47 (6th Cir. 2008) (adverse action occurred two days after the employer learned of protected activity). But even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if she "couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525; *see also Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 341 (6th Cir. 2015) ("To be sure, this court requires a very brief interval between protected activity and adverse action before it permits a plaintiff to demonstrate causation solely on the basis of temporal proximity. But our precedent expressly rejects the district court's position that a span of more than six months between protected activity and adverse action categorically precludes finding causation." (citation omitted)). George meets his burden to show causation at least under the second of these paths.

First, given YSU's economic incentive in retaining George until the end of the 2014–2015 academic year, the close temporal proximity to the conclusion of his settlement coverage could suggest that his firing was retaliatory. "When there may be valid reasons why the adverse

employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Dixon*, 481 F.3d at 335 (quoting *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005)). This is particularly true when the alleged retaliation occurs at the first chance the employer had to take the adverse action in question. *Id.* at 334–35; *see also id.* at 335 ("This is especially true in the context of a *reinstatement* case, in which the time lapse between the protected activity and the denial of reinstatement is likely to be lengthier than in a typical employment-discrimination case.").

In this case, George's settlement agreement provides a valid explanation for why he was not fired earlier. Although the agreement only guaranteed George's reinstatement up to the end of the 2011–2012 academic year, YSU would have needed to provide George with medical coverage if they fired him before Spring 2015. George was terminated just two weeks after this deadline.

Defendants and the district court argue that this economic incentive is irrelevant, since YSU could have fired George earlier if it really wanted to. *George I*, 2019 WL 118601, at \*12. But this ignores the economic reality of the situation, in which YSU was obligated to pay part of George's benefits whether he was working or not. Since those economic incentives provide a "valid reason[] why the adverse employment action was not taken immediately" after George's protected activity, the timing of his firing can still support a finding of causation, *Dixon*, 481 F.3d at 335 (quoting *Porter*, 419 F.3d at 895), if it is "couple[d] . . . with other evidence of retaliatory conduct," *Mickey*, 516 F.3d at 525.

Second, George also presented other evidence supporting his prima facie showing of causation. Most significantly, George presented Sturrus's testimony that (1) Abraham said that "whatever years of reinstatement there were [under George's settlement agreement], were finished," and (2) when they discussed the budget cuts and YSU's need to eliminate a term position, Abraham specifically brought up George, did not mention any other term appointees. (Sturrus Dep., R. 42 at PageID #2894–96.) George also says that he was not welcomed back to YSU after his reinstatement, was barred from participation on search committees, and notes that he was the only term faculty member who was not renewed, and the only one who engaged in protected activity. *See Redlin*, 921 F.3d at 616 (noting that "different treatment of a similarly

situated employee who did not engage in conduct protected by Title VII" can, working in conjunction with other evidence, support an inference of causation).

Our dissenting colleague argues that the gap between George's initial discrimination complaint and his ultimate termination is so long as to be fatal to his prima facie case. But *Fuhr v. Hazel Park School District*, 710 F.3d 668 (6th Cir. 2013), *abrogated on other grounds by Nassar*, 570 U.S. 338, on which the dissent relies, did not present any reason why the employer was disincentivized from taking earlier adverse action. As discussed above, the opposite is true here, and *Dixon* specifically noted this distinction. 481 F.3d at 334–35. While our colleague writes off this discussion in *Dixon* as dicta, its reasoning nevertheless is sound, and this Court reached the same conclusion in the earlier holding of *Ford v. General Motors Corp.*, 305 F.3d at 554–55.

In any event, the dissent's focus on this aspect of the timeline or how many years later a retaliation claim might remain valid attempts to draw bright line rules where rightfully there are none. The question at the prima facie stage is simply whether the plaintiff has "proffer[ed] evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). While the gap in time would normally be a strike against George on this front, a juror could easily disregard that gap because of the parties' settlement agreement, especially since George was fired almost immediately after the terms of that agreement expired. When also considering George's other evidence of discrimination, a juror could reasonably infer that George was fired in retaliation for his previous lawsuit against YSU. George has thus met his burden in establishing a prima facie case of retaliation, and so the district court erred in granting summary judgment for Defendants on this basis. *See, e.g.*, *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir. 2009) (finding that a temporal proximity of fewer than three months combined with evidence of increased scrutiny on the employee was enough to support a prima facie showing of causation).

## 2. Pretext

While George's claim survives at the prima facie stage, Defendants argue that they actually fired George because of YSU's budget crisis. Thus, for George's claim to go to a jury, he must present some evidence suggesting that YSU's asserted reason is not the real reason they declined to renew his contract, or at least not the real reason he was let go as opposed to another term employee. *See, e.g.*, *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997) (pretext can be shown either "by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible"). This burden is not heavy, though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004).

George has met this burden. First, according to Defendants, the return of another professor from unpaid leave is what necessitated firing George. But George offered evidence suggesting that other term instructors had been covering that professor's courses, raising the question of why George was singled out for termination instead of one of those employees. In fact, one of those term instructors said "he was really concerned about his position" if the professor in question returned. (George Decl., R. 50-1 at PageID #4616.) To be sure, Defendants present alternative testimony suggesting that George was chosen for firing because his introductory level courses were the easiest to reassign. (*See* Lamb Dep., R. 39 at PageID #2294 ("You always hate to lose a position. You know, that's how we teach our courses. But as far as the choice of the position let go, and nothing against John George or anybody else in that position, that was the position that would easiest[] be filled with part-time faculty."); Sturrus Dep., R. 42 at PageID #2896 ("Q. But it was specifically John's name [that] came up? A. Well, it was in the context of, if we're reducing term positions, are we going to reduce term positions of people teaching courses that are upper division or courses that are remedial or, you know.").) But on summary judgment, we cannot weigh which of these stories is more credible—so long as a reasonable juror could credit George's evidence and not Defendants', the case must proceed to a trial. *Jackson*, 814 F.3d at 775; *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir.

2015) ("'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' In undertaking this inquiry, 'credibility judgments and weighing of the evidence are prohibited.'" (alteration in original) (first quoting *Anderson*, 477 U.S. at 249; and then quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010))).

George also presents evidence suggesting that the college had several faculty retirements and stable enrollment, which further undercuts YSU's offered reason for firing him. And George points to Abraham's shifting explanations for who made the firing decision, and also that Abraham singled out George and specifically referenced George's settlement agreement in his initial discussion with Sturrus about cutting the term position, as further evidence of pretext. *See, e.g.*, *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996))). While Defendants again present testimony in an effort to rebut these claims, this only adds to the genuine dispute of fact created by George's contrary evidence. To resolve this dispute in Defendants' favor would supplant our view of the evidence for that of the jury, which is improper when a reasonable juror could find otherwise. *Jackson*, 814 F.3d at 775; *Moran*, 788 F.3d at 204.

In similarly arguing for the rejection of George's claim based on a failure to show pretext, the dissent commits two errors that warrant a response. First, the dissent focuses on evidence supporting YSU's claimed budgetary need to cut a term faculty position, and says that George's claim must be dismissed for failing to rebut this proposition. But the question is not whether YSU's reason for cutting *any* term position was pretextual, but rather whether a reasonable juror could find that this proffered reason was a pretext for cutting George's position in particular. As noted above, George put forward evidence that another professor was more expendable under the circumstances. By crediting YSU's explanation for why George was chosen for firing and disregarding George's contrary evidence, the dissent errs in weighing the evidence in favor of Defendants, instead of in favor of George as the law requires.

Second, the dissent leans on *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), and seeks to expand it in contradiction our longstanding summary judgment standard. While the dissent claims that George needed to show that the "sheer weight of the circumstantial evidence" supports a finding of discrimination (Dissent at 35 (quoting *Manzer*, 29 F.3d at 1084)), this discussion in *Manzer* referred to the plaintiff's ultimate strategy at trial, and simply concluded that the plaintiff must provide more than "the bare bones elements of [her] prima facie case." *Manzer*, 29 F.3d at 1084.[4] By looking to things like Abraham's lack of ill will toward George and deciding that YSU's evidence offsets George's other proof of discrimination, our colleague shoots well past this standard and supplants the jury's balancing of the evidence with his own.

As the dissent properly notes, "[o]ur role is limited in these types of cases" (Dissent at 36): while federal courts cannot "act as super personnel departments," *Lee v. City of Columbus*, 636 F.3d 245, 258 (6th Cir. 2011) (quoting *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006)), neither can they resolve disputed facts on motions for summary judgment. Because George has presented evidence that casts doubt on Defendants' asserted reason for firing him (at least as opposed to firing a different term instructor), he has also created a genuine dispute of fact at the pretext stage of the *McDonnell Douglas* framework. Defendants are not entitled to summary judgment, and George's retaliatory termination claim must proceed to a trial.

## C. Failure-to-Hire Claims

In addition to his termination as an assistant professor, George also challenges YSU's failure to hire him for three other positions: (1) Director of Dual Enrollment and Student Support Services, (2) Assistant Director of Research Services, and (3) Lecturer in the School of

---

[4]For context, *Manzer* came to us on appeal from a directed verdict after trial. 29 F.3d at 1080.

Technology teaching first-year engineering technology courses.  George says that YSU's refusal to hire him was the product of either retaliation or age discrimination.**5**

For two of these positions—Director of Dual Enrollment and Student Support Services and Assistant Director of Research Services—the district court found that George failed to show that YSU's offered reason for refusing to hire him was pretextual.  *George I*, 2019 WL 118601, at *8, *10–11.  On the second of these, the court also found that George failed to demonstrate a causal connection between his protected activity and YSU's hiring decision.  *Id.* at *11.  And for the lecturer position in the School of Technology, the district court dismissed the claim because George had not administratively exhausted it before the EEOC.  *George II*, 2019 WL 2330465, at *3–4.  Defendants also raise additional arguments in support of summary judgment on appeal.

On each of these points, George's evidence demonstrates a genuine dispute of material fact, and in proceedings below, Defendants expressly waived the administrative exhaustion requirement and agreed for the court to address the lecturer claim on its merits.  Thus, we also reverse the district court's grant of summary judgment for George's failure-to-hire claims.

### 1.  Director of Dual Enrollment and Student Support Services

George first claims that YSU discriminated against him on the basis of age when it hired a significantly younger candidate as the Director of Dual Enrollment and Student Support Services, thereby violating the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1).  Defendants say that George cannot prevail on this claim because he was not actually qualified for the position, namely because he did not have a master's degree in mathematics.

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker."  *Mickey*, 516 F.3d at 521; *accord, e.g.*, *Reeves v.*

---

**5**While George asserted failure-to-hire claims for several other positions as well, he has abandoned these claims on appeal. *See, e.g.*, *Burgess*, 735 F.3d at 477 n.2; *Smith*, 376 F.3d at 533.

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Bender*, 455 F.3d at 620. In their motion for summary judgment, Defendants only challenged George's qualification for the job.

The district court held that a reasonable juror could find George's educational background and other credentials "equivalent to the minimum objective criteria required for the position." *George I*, 2019 WL 118601, at *8. This finding was well supported by the law and the facts. A plaintiff can satisfy the qualification prong of her prima facie case "by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc). "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576.

In this case, George had bachelor's degrees in math and engineering, a master's degree in education with a concentration in mathematics, and a doctorate in education. He was also licensed to teach mathematics and physics for grades 7–12 in Ohio. George elicited testimony from YSU faculty and members of the search committee that YSU generally considers equivalent credentials when assessing a candidate's educational qualifications. And in fact, YSU did consider equivalents with respect to another candidate for this position, whose MBA was assessed for whether it could be equivalent to a master's in mathematics. Perhaps most significantly, one member of the search committee specifically asked if George could be considered for the job even without the master's in math based on his other qualifications, but this suggestion was nevertheless rejected. On these facts, a reasonable juror could find that George met the minimum objective qualifications required for the Director of Dual Enrollment and Student Support Services job.

Defendants argue that the district court should have deferred to YSU's search committee with respect to whether George's qualifications were or could be equivalent to the posted requirements for the job. But this would conflate the stages of the *McDonnell Douglas* framework by considering YSU's asserted reason for not hiring George at the prima facie stage. "To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity

to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler*, 317 F.3d at 574; *accord Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000). The district court was correct to independently assess whether a reasonable juror could find that George's qualifications were equivalent to those required for the position.

Defendants never moved for summary judgment based on George's failure to show pretext in response to YSU's asserted legitimate basis for not hiring him. But parts of George's opposition to the motion could be read as discussing pretext, and the district court proceeded to address pretext and granted Defendants summary judgment on that ground. *George I*, 2019 WL 118601, at *8.

Even assuming without deciding that it was correct to rule on this basis, the district court erred in granting Defendants summary judgment because the record presents a genuine dispute of material fact as to pretext. The district court focused on George's inability to connect his evidence of Seitz's preselection with their comparative ages. *Id.* But this misconstrues the plaintiff's burden at the pretext stage of the *McDonnell Douglas* framework, where the plaintiff can make the necessary showing not just by proving discriminatory animus, but alternatively by casting doubt on the defendant's asserted nondiscriminatory basis. *See, e.g.*, *Reeves*, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *Laster*, 746 F.3d at 730 (noting that the plaintiff's burden at the pretext stage is "to demonstrate that Defendants' proffered reason was not the true reason for the employment decision"); *Kline*, 128 F.3d at 342–43 ("Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible.").

George has presented evidence allowing a reasonable juror to discount YSU's asserted reason for hiring Seitz over him. For example, George provided evidence suggesting that Seitz was preselected for the job and that YSU changed the posted job requirements (specifically, delaying the deadline for earning a master's in mathematics) to ensure that Seitz would be eligible. Though not direct proof of a discriminatory motive, this evidence casts doubt on YSU's

claimed reason for hiring Seitz: that she was qualified for the job and George was not. *See, e.g.*, *Kimble v. Wasylyshyn*, 439 F. App'x 492, 497–501 (6th Cir. 2011) (holding that irregularities in the interview process and a "pre-rejection" of the applicant can support pretext); *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986) ("Evidence of preselection operates to discredit the employer's proffered explanation for its employment decision.").

Furthermore, because YSU's claimed reason for not hiring George was that he was unqualified for the position, the question of pretext somewhat overlaps with that prong of the prima facie case (perhaps explaining why Defendants did not separately move for summary judgment on this basis). *Cf., e.g.*, *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (discussing this relationship and the additional evidentiary requirements at the pretext stage). And as discussed above, George presented enough evidence for a jury to find that his qualifications were equivalent to the posted requirements for the job, and that YSU considered such equivalents both generally and specifically for this position. Because a reasonable juror could infer that YSU's asserted basis for rejecting George was pretextual, George's failure-to-hire claim for Direct of Dual Enrollment and Student Support Services should proceed to trial.

**2. Assistant Director of Research Services**

On George's claim for the Assistant Director of Research Services position, the district court erred in granting summary judgment, as George met his burden to show that Defendants' claimed reason for not hiring him was pretextual. While Defendants say the legitimate reason they did not hire George was that he was not impressive in his interview, George offers several pieces of evidence that a reasonable juror could rely on to doubt this explanation. Thus, George has presented a genuine issue of fact on this point.

Much of George's evidence suggests irregularities with the search process, which can raise a genuine issue of fact as to whether an employer's asserted reason is pretextual. *Kimble*, 439 F. App'x at 500; *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004); *see also Ray v. Oakland Cty. Circuit Court*, 355 F. App'x 873, 885 (6th Cir. 2009) (Clay, J., dissenting) ("[I]rregularity suggests improper subjectivity, and 'subjective reasons provide "ready mechanisms for discrimination."'" (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d

444, 461 (6th Cir. 2004))). For example, on an internal form, YSU identified differences in qualifications between some of the candidates in the search and Riggleman, the applicant who got the job. But YSU conspicuously did not identify why Riggleman's qualifications were better than George's (though it did so for other relevant candidates). Instead, YSU left that part of the form blank, even though the form noted that such a comparison "must" be included. (Search Notes, R. 48-22 at PageID #3958.) And in another irregularity, Hripko—the head of the office— had a close relationship with Abraham and sat in on only one interview: George's. George also notes that Riggleman met both Hripko and the search committee chair in Utah and applied within twenty-four hours of the posting, suggesting that she had an inside track. And while YSU pointed to Riggleman's familiarity with the Moderas software as another reason to hire her, Moderas was never listed in the search qualifications for the job and was never actually implemented at YSU.

George further contests as a factual matter that he was not impressive in his interview. Such subjective evaluations by the employer—at least where contested by the employee— require close examination because they have a greater susceptibility for being a smokescreen for pretext. *See, e.g.*, *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'" (quoting *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003))); *Grano v. Dep't of Dev.*, 699 F.2d 836, 837 (6th Cir. 1983) (per curiam) ("Courts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination."). Taken together, George's evidence could allow a reasonable juror to reject YSU's asserted reason for not hiring him, and so Defendants should not have been granted summary judgment on this claim.

The district court also found that, with respect to the retaliation version of this claim, George had not established a causal link between his EEOC charge and the failure to hire him some nine months later. *George I*, 2019 WL 118601, at *11. But Defendants never moved for summary judgment on this basis. Before a court can grant summary judgment "on grounds not raised by a party," the parties must be provided "notice and a reasonable time to respond." Fed.

R. Civ. P. 56(f)(2); *see also, e.g.*, *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 828–32 (6th Cir. 2013) (discussing Rule 56(f) and reversing the district court's sua sponte grant of summary judgment on alternative grounds). This rule is important because a district court does not have before it the full factual record developed by the parties in discovery. Rather, a party opposing summary judgment will supply only the evidence needed to demonstrate a genuine dispute as to the issues raised in the motion. *See, e.g.*, *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000) (noting that the purpose of the rule is to ensure that the losing party was informed of the requirement "to come forward with all of [its] evidence" (alteration in original) (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998))). Accordingly, the district court should not have granted summary judgment on this ground absent a chance for George to respond with appropriate evidence. *See* Fed. R. Civ. P. 56(f)(2); *Smith*, 708 F.3d at 828–32.

Furthermore, the existing record supports a plausible inference of retaliation. First, the Research Services job was the first one to which George applied after filing his EEOC charge, and so rejecting him for this position was YSU's first opportunity to retaliate against him since he engaged in protected activity. *See Dixon*, 481 F.3d at 334–35 (noting that a lack of earlier opportunity to retaliate can justify a temporal gap between the employee's protected activity and the adverse employment action). Second, some of the irregularities mentioned above in the pretext context also support a prima facie showing of causation, at least when combined with the timing of this decision. For example, George's was the only interview in which Hripko participated, and YSU's internal tracking document did not explain why the chosen candidate's qualifications were superior to those of George. These differences in treatment between George and the other applicants for this position are enough to establish a prima facie showing of causation. *See, e.g.*, *Redlin*, 921 F.3d at 616 (finding a genuine dispute as to causation based on "different treatment of a similarly situated employee," among other evidence); *Hamilton*, 556 F.3d at 435–36 (finding that a temporal proximity of fewer than three months combined with

evidence of increased scrutiny on the employee was enough to support a prima facie showing of causation).[6]

### 3. Lecturer in the School of Technology

Finally, George also argues that the district court erred in granting summary judgment on his failure-to-hire claim for the first-year engineering technology lecturer job. While the district court dismissed this claim for failure to receive a right-to-sue letter from the EEOC, *George II*, 2019 WL 2330465, at *3–4, George says this was wrong because Defendants expressly waived the administrative exhaustion requirement. For their part, Defendants say that the district court's administrative exhaustion ruling should stand, and alternatively, that George cannot state a prima facie claim because YSU never filled the position.[7] As explained below, Defendants are wrong on both counts, and so the district court's grant of summary judgment on this claim must be reversed.

#### a. Administrative Exhaustion

After reconsidering its finding that George had abandoned his failure-to-hire claim for the lecturer job in the School of Technology, the district court nevertheless dismissed the claim for failure to administratively exhaust it before the EEOC. *George II*, 2019 WL 2330465, at *2–4. While the court noted that Defendants agreed to waive the exhaustion requirement and

---

[6]Defendants also argue—for the first time on appeal—that George's failure-to-hire claim for Assistant Director of Research Services cannot succeed because the hiring authority for that job was unaware of George's protected activity. Because this argument was never presented to the district court, it has not been preserved for appeal. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court."). This is especially important in the summary judgment context, because George was not given the chance to develop the record in opposition to this argument. *See id.* ("[T]he rule ensures fairness to litigants by preventing surprise issues from appearing on appeal."); *see also Shelby Cty. Health Care*, 203 F.3d at 931 (noting that parties opposing summary judgment must "be afforded notice and reasonable opportunity to respond to all the issues to be considered by the court" (quoting *Emp'rs Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995))).

[7]While Defendants spend a fair amount of time in their brief noting that George never expressly referred to this position in his complaint and was late in asking to formally amend his complaint to include it, the district court noted that Defendants had previously stipulated that this claim was included within George's case. *George I*, 2019 WL 118601, at *2 n.2. Defendants have not attempted to rebut this point on appeal. (*See* Appellee Br. at 50–53; *cf.* Joint Stipulations, R. 33 at PageID #302, #306 (listing "Lecturer, School of Technology—First Year Engineering Technology" as one of the positions at issue in this lawsuit); Mot. for Summ. J., R. 45 at PageID #3585, #3591–92 (same).) In any event, this has no impact on the question of administrative exhaustion.

highlighted several of this Court's cases on the issue, the district court went on to say that it did not need to permit such a waiver, even if it could choose to do so. *Id.* at \*3. Specifically, the court said that the Supreme Court had granted certiorari to decide whether the administrative exhaustion requirement is jurisdictional, and such a ruling could later undo any further proceedings on that claim. *Id.* (citing *Fort Bend County v. Davis*, 139 S. Ct. 915 (2019) (mem.)). Accordingly, the court "decline[d] to permit waiver of Plaintiff's obligation to administratively exhaust his remedies." *Id.*

This decision was incorrect on several fronts. First, this Court's precedent—including the cases cited by the district court—prohibits sua sponte enforcement of the administrative exhaustion requirement under these circumstances. For example, in *Adamov v. U.S. Bank National Ass'n*, 726 F.3d 851, 853, 855–56 (6th Cir. 2013), we reversed the district court for sua sponte dismissing a claim based on the exhaustion requirement. Because "the question of administrative exhaustion is nonjurisdictional," the district court erred by dismissing the claim in the face of the defendant's forfeiture for failing to raise the defense. *Id.* at 856. So too in *Portis v. Ohio*, 141 F.3d 632, 634–35 (6th Cir. 1998), where the defendant failed to raise the defense in a timely manner. And in *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000), this Court expressly said that "the requirement of obtaining a right-to-sue letter may be waived by the parties."

Even if the Supreme Court granted certiorari on this issue, the district court was not at liberty to disregard binding circuit precedent prior to a ruling that abrogates our earlier decisions. *See, e.g.*, *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (holding that a published decision of the court of appeals "remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the court of appeals] sitting en banc overrules the prior decision" (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985))). And the facts here present an even more clear case for enforcement of the waiver than this Court's prior decisions: *Adamov* reversed a district court for failing to enforce *forfeiture*, 726 F.3d at 853, 855–56; here, Defendants expressly gave up their rights by saying they were willing to waive the exhaustion requirement, and in fact cited *Parry* in support of that waiver. Such an intentional surrender typically

precludes judicial consideration of a defense. *See United States v. Malone*, 646 F. App'x 454, 458 (6th Cir. 2016); *United States v. Sheppard*, 149 F.3d 458, 461 & n.3 (6th Cir. 1998); *cf. Wood v. Milyard*, 566 U.S. 463, 466, 472–73 (2012) (observing that "a federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system" and concluding that a "court is not at liberty . . . to bypass, override, or excuse a State's deliberate waiver of a limitations defense").

Second, the Supreme Court ultimately left this Court's prior rulings in place, maintaining that the administrative exhaustion requirement is a claim processing rule and therefore is "subject to forfeiture" by the defendant. *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1851–52 (2019). In fact, the decision affirmed in *Davis* was the Fifth Circuit's reversal of the district court's enforcement of the exhaustion requirement despite a forfeiture by the defendant. *Davis v. Fort Bend County*, 893 F.3d 300, 307–08 (5th Cir. 2018), *aff'd*, 139 S. Ct. 1843. The enforcement of the exhaustion requirement here, in the face of a deliberate waiver, would be far out of step with this holding.

#### b. *Prima Facie Case*

Defendants also argue—as an alternative basis for affirming the district court—that George has failed to establish a prima facie case of retaliation.**[8]** This is because, they say, YSU never filled the first-year lecturer position, and so George cannot show that he was passed over in favor of another applicant. But Defendants' arguments on this point misstate the requirements for a prima facie case and ignore a factual dispute in the record as to the status of this position.

First, Defendants seem to argue that an employee can never establish a prima facie failure-to-hire case when the position in question remains unfilled. This is not correct. To establish a prima facie case for a failure to hire, the plaintiff must show that, after she was rejected, the employer either (1) filled the position with someone outside of the plaintiff's protected class (or, for the ADEA, with a substantially younger person), or (2) kept the position open and continued to seek other applicants. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310–13 (1996); *McDonnell Douglas*, 411 U.S. at 802; *Barnes v. GenCorp Inc.*,

---

**[8]**Defendants do not raise any other stage of the *McDonnell Douglas* framework with respect to this claim.

896 F.2d 1457, 1464 (6th Cir. 1990); *accord, e.g.*, *Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008); *Burdine*, 450 U.S. at 253 & n.6. Even though YSU never filled the position, George's claim can still proceed through the second of these tracks.[9]

Second, even if we read Defendants' motion as arguing that YSU closed the position and abandoned its search, there is a genuine dispute of fact as to this point. While Defendants cite deposition testimony indicating that the position is no longer open and that YSU is no longer seeking applicants for the job (*see, e.g.*, Lamb Dep., R. 39 at PageID #2310 ("Q. And what is that status of this position? A. It is not going to be filled.")), the dean of the STEM college testified that the position remains open (*see* Steelant Dep., R. 49-7 at PageID #4462–63 ("Q. Okay. And the lecturer position, where does that stand in your mind? A. So far it's open, and again, you know, due to the complexity, that's now with legal.")). Given this factual dispute, Defendants are not entitled to summary judgment on this claim.

## CONCLUSION

For the reasons stated above, we reverse the district court's grant of summary judgment and remand this case for further proceedings consistent with this opinion.

---

[9]Defendants' arguments on appeal also seem to concern age discrimination claims, but George's claim regarding this position is actually for retaliation. *See George II*, 2019 WL 2330465, at *2.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ROGERS, Circuit Judge, concurring in part and dissenting in part. I concur with the majority's disposition of George's failure-to-hire claims but would affirm the judgment of the district court with respect to George's claim that his contract was not renewed in retaliation for an earlier discrimination lawsuit. I join all but Part II.B of the majority opinion.

George sued YSU in 2006 for alleged discrimination in connection with his denial of tenure. George negotiated a settlement with YSU in February 2008, the terms of which required George's reinstatement as a term professor until 2012 and provision of health insurance for George until 2015. YSU more than fulfilled its obligations under the settlement. It employed George as a term professor until 2012 and then kept him on for an additional three years. YSU also continued paying George's health insurance until the agreed-upon date in 2015. Although YSU decided not to sign George to a term contract for the 2016 academic year, it did hire George for a part-time position that year.

George's retaliation claim fails at the prima facie stage because there is no genuine issue of fact as to the required element of causation. The nine-year gap between George's 2006 lawsuit and YSU's decision not to rehire George in 2015 is far too long to infer a causal connection between the two events. While close temporal proximity between the exercise of protected conduct and an adverse employment action can support an inference of causation, a long temporal gap can by itself be "fatal" to a plaintiff's retaliation claim. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676 (6th Cir. 2013), *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam). The nine-year time-gap in this case vastly exceeds the two-year gap in *Fuhr* that we held defeated a showing of causation. 710 F.3d at 675-76. Significantly, the plaintiff in *Fuhr*, as in this case, presented other evidence purportedly demonstrating retaliatory animus on the part of the defendant. *Id.* at 671-72. This evidence was insufficient, however, in light of the excessive lag time between the protected conduct and the adverse employment action. *Id.* at 676.

It is true that in *Dixon v. Gonzales*, 481 F.3d 324, 334-35 (6th Cir. 2007), relied upon by George, we observed in dictum that a ten-year gap between the protected conduct and the adverse employment action would not necessarily preclude a finding of causation. But in *Dixon* we distinguished cases supporting that dictum where the employer lacked an opportunity to retaliate before it took the adverse employment action. *Id.* at 335. In *Dixon*, the plaintiff's prima facie case failed because it was undisputed that the plaintiff's alleged harasser ten years earlier had since supervised the plaintiff and signed off on positive evaluation reports. *Id.* Similarly in this case, it is undisputed that Martin Abraham, who purportedly made the decision not to rehire George, had given glowing performance evaluations of George in each of the three years leading up to George's dismissal. Abraham could have used his supervisory position to, in *Dixon*'s words, "torpedo [George's] career." *Id.* at 336. He did not. Further, the fact that YSU had an economic incentive to retain George until shortly before his dismissal is beside the point given Abraham's earlier opportunity to retaliate. The *Dixon* court dismissed as "irrelevant" the plaintiff's explanation for why the retaliation had not occurred prior to the adverse employment action. *Id.* An "opportunity to retaliate," we said, "is all the law requires." *Id.*

Also inconsequential is the close temporal proximity between the end of YSU's settlement obligations and YSU's decision not to rehire George. Temporal proximity for purposes of a plaintiff's prima facie case is properly measured from the date the employer *learns* of the protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). George exercised his right to sue for alleged discrimination back in 2006, and Abraham, who administered George's settlement agreement in 2007, would have been aware of the protected activity since that time.

We analyzed temporal proximity along similar lines in *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014). There, a college professor alleged that her former university sued her to recover sabbatical pay in retaliation for her husband's exercise of protected conduct seven months earlier. *Benison*, 765 F.3d at 661. We noted that the seven-month gap between the protected conduct and the alleged retaliatory lawsuit was, on its own, insufficient to infer causation. *Id.* This was the case even though the university could not have sued the plaintiff until her resignation only two weeks earlier. *Id.*

There is no question that George's termination after, rather than before, the expiration of his health benefits was to a limited degree advantageous to YSU. It cannot be the law, however, that an employee who at one time made an allegation of discrimination is effectively insulated from adverse action for as long as some limited benefit inures to the employer from delaying the adverse action.

The other evidence of retaliatory intent put forth by George fails to overcome the exceptionally long time-gap in this case. First, in a conversation with interim dean Gregory Sturrus about budget cuts, Abraham brought up George's name but not the name of any other term-appointed professor. Abraham told Sturrus that George's reinstatement years were "finished" under the settlement agreement. This statement is innocuous considering the context in which it was made. Sturrus at the time was new to the job and admitted to not previously knowing the terms of the settlement with George. Sturrus would have needed to be informed that the university was not required by law to retain a professor before making upcoming staffing decisions. To the extent George was singled out in this conversation, it was because he was the only relevant faculty member who in years past obtained an obligation by YSU to be rehired.

George asserts he suffered various forms of mistreatment upon reinstatement purportedly as a result of his lawsuit. None of this alleged mistreatment, however, can be linked to Abraham. George says he was barred from participation on university search committees by his direct supervisors David Kurtanich and Carol Lamb and was denied his preferred course assignments by Kurtanich. George also claims that his colleagues Brian Vuksanovich and Mike Costarell voiced displeasure about George's return in 2006. We have held that statements and actions by non-decisionmakers "cannot be taken as evidence of a retaliatory motive" at the prima facie stage. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001); *accord Benison*, 765 F.3d at 662. Accordingly, absent a showing—or even an allegation—that Abraham had a role in George's cold reception or was influenced by it, this evidence does nothing to show George's 2006 lawsuit was the cause of Abraham's decision not to rehire George.

Finally, although it may be true that George was the only term professor not to be retained in 2015 and the only term professor who engaged in protected activity, these facts alone are not sufficient to establish a prima facie case of causation. *Redlin v. Grosse Pointe Public*

*School System*, 921 F.3d 599, 616 (6th Cir. 2019), relied upon by George, does not hold that such facts are alone sufficient.

Even assuming George established a prima facie case of retaliation, he has failed to demonstrate a genuine issue of fact that YSU's stated reasons for not renewing him were pretextual. There are generally three methods of showing pretext: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [plaintiff's] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks omitted); *accord Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997). YSU argues that it could not afford to retain George because (1) it was facing a budget shortfall of over $10 million and (2) that a tenured faculty member, Brian Vuksanovich, was coming back from a three-year period of unpaid leave.

George contends that the purported financial considerations motivating his dismissal were baseless. But rather than refute YSU's steep budget shortfall or the return of Vuksanovich from unpaid leave, George contends that the department in which he worked was on strong financial footing. We recently rejected this type of argument in *Alberty v. Columbus Township*, 730 F. App'x 352, 361-62 (6th Cir. 2018) (unpublished). In any event, the record contains unrebutted evidence that, despite the engineering department's relative financial stability, it was nonetheless tasked with helping to close the university's overall budget deficit on a yearly basis.

George next argues that even assuming YSU's budget crisis was real, it was not sufficient to motivate his dismissal. This argument best fits under the third *Manzer* method, which "ordinarily[] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. George points to evidence showing that another professor—Doug Gross—should have been the one on the chopping block because he was teaching the courses that Vuksanovich (the professor coming back from leave) would otherwise have been teaching. But YSU puts forth the essentially uncontested explanation that, from a cost standpoint, George was the most expendable of the term professors, including Gross, because George taught the lowest-level

courses.  YSU contends that in comparison to the specialized courses taught mainly by the other term professors, George's introductory and remedial courses could be more easily reassigned to lower-cost adjunct professors.  George does not contest this contention on appeal.  Indeed, the lower-level classes formerly taught by George were handled by adjunct professors in the year following George's departure.  George has thus failed to demonstrate a genuine issue of fact that he was similarly situated in all relevant respects to the term professors such as Gross, who were retained, as required to show pretext under the third *Manzer* method.  *See Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).

Unable to succeed via the first or third avenues discussed in *Manzer*, George is left with the second one.  A plaintiff using the second method "'admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal,' but 'attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant.'"  *Johnson*, 319 F.3d at 866 (quoting *Manzer*, 29 F.3d at 1084).  In addition to the evidence already discussed, the majority notes evidence of Abraham's "shifting explanations" for who at YSU made the decision not to rehire George.  Put simply, this evidence does not create a genuine issue of material fact with respect to the second *Manzer* method, which ultimately requires a showing that the "sheer weight of the circumstantial evidence" of retaliation makes it "more likely than not that the employer's explanation is a pretext, or coverup."[1]  *Id.* at 871 (quoting *Manzer*, 29 F.3d at 1084).  Nothing in the record explains why Abraham would have harbored any ill will towards George.  To the contrary, Abraham consistently praised George in official evaluations from 2012 through 2014, years in which the university chose to rehire George to three consecutive one-year contracts.  Moreover, the evidence of hostility George points to in the aftermath of his 2006 lawsuit cannot be imputed to Abraham.

---

[1]Our court has repeatedly applied the "sheer weight of the evidence" standard in this way in reviewing summary judgments.  *See, e.g.*, *Russell v. Univ. of Toledo*, 537 F.3d 596, 606-07 (6th Cir. 2008); *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 368 (6th Cir. 2007); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004); *Johnson*, 319 F.3d at 866-68.

Our role is limited in these types of cases. Federal courts do not "act as super personnel departments to second guess an employer's facially legitimate business decisions." *Lee v. City of Columbus*, 636 F.3d 245, 257-58 (6th Cir. 2011) (quoting *Adams v. Tenn. Dep't of Fin. and Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006)). George was an at-will employee, and YSU was within its rights not to renew George's contract on the grounds it provided, once it had met all its obligations under the previous litigation.