RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOHNNY STRICKLAND,

  *Plaintiff-Appellant*,

    *v.*

CITY OF DETROIT, MICHIGAN; JAMES CRAIG; MARK
BLISS; RODNEY BALLINGER; STEVEN MURDOCK;
CASEY SCHIMECK; DEANNA WILSON,

  *Defendants-Appellees*.

┐
│
│
│
├  No. 19-2373
│
│
│
┘

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-12640—Nancy G. Edmunds, District Judge.

Argued: October 23, 2020

Decided and Filed: April 22, 2021

Before: CLAY, GIBBONS, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Mark P. Fancher, AMERICAN CIVIL LIBERTIES UNION FUND OF
MICHIGAN, Detroit, Michigan, for Appellant. LaKena Crespo, CITY OF DETROIT LAW
DEPARTMENT, Detroit, Michigan, for Appellees. **ON BRIEF:** Mark P. Fancher, Daniel S.
Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit,
Michigan, Leonard Mungo, MUNGO & MUNGO, Bingham Farms, Michigan, for Appellant.
LaKena Crespo, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees.

  CLAY, J., delivered the opinion of the court in which GIBBONS, J., joined, and
NALBANDIAN, J., joined in part. GIBBONS, J. (pp. 26–29), delivered a separate concurring
opinion. NALBANDIAN, J. (pp. 30–35), delivered a separate opinion concurring in part and
dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiff Johnny Strickland appeals, in part, the district court's order granting summary judgment in favor of his employer, the City of Detroit ("the City"), as well as Detroit Police Chief James Craig, Commander Mark Bliss, Sergeant Rodney Ballinger, Officer Steven Murdock, Officer Casey Schimeck, and Sergeant Deanna Wilson.   On appeal, Plaintiff claims that the City maintained a hostile work environment, in violation of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e *et seq.*, and retaliated against him for reporting racial discrimination, also in violation of Title VII, specifically § 2000e-3(a).   He also asserts that Officer Schimeck is not entitled to qualified immunity on his excessive force claim brought pursuant to § 1983.   For the reasons that follow, we affirm in part and reverse in part the district court's grant of summary judgment.

**BACKGROUND**

**A.  Factual Background**

Plaintiff is an African American police officer.   He has been employed by the Detroit Police Department ("the Department") since January 2008.   He was promoted to sergeant during the pendency of this case. Plaintiff argues that he has been subjected to harassment based on race throughout his tenure as a police officer.   His claims also focus on a January 22, 2017 incident when he was arrested by fellow Detroit police officers and the Department's response to his complaint about that incident.

**1.  Workplace Harassment**

Plaintiff points to a number of incidents, social media posts, and Department reports as contributing to or confirming the existence of a racially hostile workplace during his career as a Detroit police officer.   These include the following:

- An African American friend and co-worker was called "boy" by a white police officer.

- A statement in 2015 by Assistant Chief Steve Dolunt that: "Some whites don't like blacks, some blacks don't like whites. Some men don't like women, some women don't like blacks. I've dealt with racial tension before. And I'm not the most PC person, but get over it. You're wearing blue." (News Article, R. 36-16, Page ID #945.)

- A social media post by a Department employee stating: "The only racists here are the piece of shit black Lives Matter terrorists and their supporters . . . ." (EEOC Charge, R. 36-15, Page ID #939.)

- An online post by a Department employee stating: "Getting rid of residency was the best thing that ever happened to the Detroit Police!!! We have to police the garbage but you can't make us live in the garbage." (*Id.*)

- A Snapchat video that surfaced in 2019 depicting Detroit police officers mocking a stranded African American female motorist with captions including: "What black girl magic looks like" and "Celebrating Black History Month." (Sixth Precinct Environmental Audit, R. 39-2, Page ID #1025.)

- A Snapchat post of a uniformed officer captioned: "Another night to Rangel [*sic*] up these zoo animals." (News Article, R. 39-3, Page ID #1045.)

- Body camera footage showing Corporal Gary Steele and Officer Michael Garrison referring to African Americans as "Keishas" and "Homies." (Sixth Precinct Environmental Audit, R. 39-2, Page ID #1030.)

These alleged instances only represent a portion of the racial harassment that Plaintiff has observed in over a decade at the Department. In addition, he claims he has directly experienced racial discrimination. He contends that he was denied desired shift assignments and trainings in favor of white officers. At one point, he worked in the same precinct as Steele and Garrison, who were responsible for a number of racial incidents, and despite his efforts to talk to them, they would not speak to him and isolated him. Plaintiff personally observed white supervisors disrespecting African American officers throughout his tenure as a police officer and was disrespected himself.

Two Department reports recognized racial issues in the Detroit police force. In response to concerns about inequality related to race, gender, and sexual orientation, Police Chief James Craig formed the Committee on Race and Equality ("CORE"). The CORE report was submitted to Chief Craig on January 12, 2017. The committee concluded "that the department has a

growing racial problem." (CORE Report, R. 39-4, Page ID #1048.) It reached this conclusion after its investigation uncovered discriminatory practices like segregated units, which were predominantly staffed by white officers in a majority African American police force. Moreover, the CORE committee also found that African American officers who complained about bias in appointments and training were retaliated against.

Similarly, in response to the Snapchat post of officers stranding and mocking an African American motorist that surfaced in February 2019, Chief Craig ordered an environmental audit of the Department's Sixth Precinct. Although Plaintiff never worked in the Sixth Precinct, a co-chair of the CORE committee, retired police officer John Bennett, affirmed that "[t]he problems that Chief Craig is at long last addressing in the Sixth Precinct were observed in varying degrees throughout the police department by the CORE committee in 2016." (Bennett Aff., R. 39-5, Page ID #1057.) As a result of the audit, "the Department conclude[d] that the 6th Precinct is racially divided. Although this racial division does not appear to be widespread throughout the entire precinct, the amount of racial division exists at a level warranting further corrective measures." (Sixth Precinct Environmental Audit, R. 39-2, Page ID #1030.)

### 2. January 22, 2017 Incident

On January 22, 2017, Plaintiff was berated, handcuffed, and arrested by his fellow officers. Shortly after his shift had ended that morning, Plaintiff pulled into a gas station off Jefferson Avenue near his home in Detroit. Unbeknownst to him, the gas station was the site of an active police investigation of a reported incendiary device. Due to a thick fog, Plaintiff could not see the firetrucks that were at either end of the street or the police cars with their lights on before he pulled into the gas station.

When he exited his vehicle, Plaintiff heard a commotion, but, again, due to the fog, he could not see the source. Someone, who did not identify himself, yelled, "What the fuck are you doing? Get the fuck out of there. Get the hell away from there." (Strickland Dep., R. 36-3, Page ID #764.) Once Plaintiff saw a uniformed Sergeant Rodney Ballinger emerge from the fog, he immediately identified himself as a police officer. Sergeant Ballinger continued to scream and yell at Plaintiff, said he did not care if Plaintiff was a police officer, and ordered Plaintiff to put

his hands up. Sergeant Ballinger then placed handcuffs on Plaintiff that were extremely tight and did not double lock them, which is a technique used to prevent the handcuffs from tightening further. Sergeant Ballinger then walked Plaintiff out of the gas station, belittling him as stupid and dumb.

Eventually they reached Sergeant Ballinger's scout car, where they were met by Officer Casey Schimeck and Officer Lawrence Blackburn. Sergeant Ballinger continued to mock Plaintiff in front of the other officers. Sergeant Ballinger then left Plaintiff with Officer Schimeck. She grabbed a hold of his handcuffs, lifting them up, and tightening them further. Plaintiff told Officer Schimeck that the handcuffs were too tight, and she did not respond. Eventually, Officer Blackburn loosened the handcuffs. Plaintiff was diagnosed with a bilateral wrist contusion after the incident.

### 3. Disciplinary Action Against Plaintiff

Plaintiff was disciplined as a result of the January 22, 2017 incident and suspended for three days without pay or benefits. Plaintiff testified that on the scene, now-Commander Mark Bliss told him that if he complained about the incident there would be consequences.

Plaintiff did complain to the Department that Sergeant Ballinger, Officer Blackburn, and Officer Schimeck had mistreated him during the January 22, 2017 incident. An internal affairs investigation was initiated, and Plaintiff eventually became its prime target. Sergeant Deanna Wilson, the lead internal affairs officer on the investigation, concluded "that the actions of all [officers] on scene inclusive of Officer Strickland were improper from the verbiage utilized by the responding officers to the refusal of a direct order from a law enforcement officer which perpetuated the events that followed." (Internal Affairs Report, R. 36-7, Page ID #889.) Formally, Plaintiff was charged with three violations of the Department's code of conduct. First, he was charged with abusing his authority and position as a police officer to obtain access to the gas station's video of the January 22, 2017 incident. Second, he was charged with withholding information related to an ongoing investigation by failing to provide that video to the Department. Third, Plaintiff was charged with neglect of duty for failing to document his viewing of the video in his activity log.

**B.  Procedural History**

Plaintiff sued the City for creating a hostile workplace and the City and Sergeant Wilson for illegal retaliation, both in violation of Title VII.  He also sued the City, Chief Craig, Commander Bliss, Sergeant Ballinger, Officer Steven Murdock, and Officer Schimeck under § 1983, claiming an unlawful search and seizure and the use of excessive force in connection with the January 22, 2017 incident.  His last claim was under § 1981 for interference with contractual rights.  Following discovery, Defendants moved for summary judgment on each of Plaintiff's claims, and the district court granted the motion in its entirety.  Plaintiff now appeals the district court's grant of summary judgment on his Title VII hostile workplace and retaliation claims.  He also appeals the district court's grant of summary judgment on qualified immunity grounds to Officer Schimeck with regard to his excessive force claim.  He does not appeal the dismissal of his search and seizure or § 1981 claims.

## DISCUSSION

**A.  Standard of Review**

We review a district court's grant of summary judgment *de novo*.  *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute of material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Jackson v. VHS Detroit Receiving Hosp., Inc.* ("*Jackson-VHS*"), 814 F.3d 769, 775 (6th Cir. 2016) (citation omitted).

A court must view the evidence in the light most favorable to the party opposing the motion for summary judgment.  *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020).  "This includes drawing 'all justifiable inferences' in the nonmoving party's favor."  *George*, 966 F.3d at 458 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Jackson-VHS*, 814 F.3d at 775 (quoting *Anderson*, 477 U.S. at 249).

**B. Hostile Workplace Claim**

Plaintiff claims that the City created a hostile work environment based on race under Title VII.  To establish liability for a hostile work environment, a plaintiff must show that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) that harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action.  *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020).

The district court granted the City's motion for summary judgment after determining that "a reasonable jury could not find that the January 22 incident was based on race," and therefore could not constitute racial harassment supporting Plaintiff's hostile workplace claim.  *Strickland v. City of Detroit*, No. 18-12640, 2019 WL 5737577, at *5 (E.D. Mich. Nov. 5, 2019).  The district court also questioned whether some of the racially charged social media posts relied upon by Plaintiff could be considered in evaluating his hostile workplace claim because they postdated the filing of Plaintiff's lawsuit, and it appeared that Plaintiff only learned of them in the course of this litigation.  *Id.* at *6.  The district court ultimately considered these posts as actionable racial harassment, although it discounted their weight because of the ambiguity in how Plaintiff became aware of them.  *Id.* at *8–*9.  It granted summary judgment to the City on the ground that Plaintiff had failed to demonstrate a genuine issue of material fact that the racial harassment he experienced was sufficiently severe or pervasive to alter the conditions of his employment. *Id.* at *9.

For the reasons that follow, we find that the district court correctly held that the January 22, 2017 incident was not racial harassment actionable under Title VII and that summary judgment was appropriately granted to the City on Plaintiff's hostile work environment claim.

**1. Harassment Based on Race**

Plaintiff challenges the district court's finding that the January 22, 2017 gas station incident was not racial harassment.  Under *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80–81 (1998), a plaintiff can demonstrate discriminatory harassment by either

pointing to the use of race-specific and derogatory terms or by "offer[ing] direct comparative evidence about how the alleged harasser treated members" of other races.  With respect to the January 22, 2017 incident, Plaintiff explicitly disclaims that the officers used any race-specific language. He also offers no relevant "direct comparative evidence" of differential treatment.  For example, in *Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298, 308–09 (6th Cir. 2016), this Court affirmed that a defendant was not entitled to judgment as a matter of law because of testimony that the harassing employee had touched at least seven coworkers, "all of them male," in a mixed-sex workplace. Here, Plaintiff urges the Court to consider the January 22, 2017 incident in the context of the CORE report, which was published ten days before and documented discrimination, intimidation, and retaliation against African American officers.  Such a perspective, according to Plaintiff, "leads to the logical conclusion that the actions of the white officers [on January 22, 2017] were consistent with an institutional culture that not only condones but encourages routine disrespect for black officers."  (Appellant's Br. 22.)  This inference does not create a genuine issue as to whether the January 22, 2017 incident was harassment based on race under *Oncale*.  *See Oncale*, 523 U.S. at 81 (holding that "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive . . . connotations").  The district court did not err in refusing to consider the January 22, 2017 incident when evaluating Plaintiff's hostile workplace claim.

In contrast, other conduct cited by Plaintiff that lacked explicit racial animus nevertheless constitutes racial harassment under Title VII.  Plaintiff testified that an African American colleague had been called "boy" by a white officer.  Although not explicitly racial, a white officer referring to an adult African American colleague as "boy," without "modifiers or qualifications" can qualify as evidence of impermissible racial bias.  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).  Likewise, referring to residents of Detroit as "garbage" is not explicitly racial, but Detroit is a majority African American city and could be understood, as it was by Plaintiff, as harassment based on race.

The City's argument that a former Department assistant chief's comments dismissing concerns of racial tension "include race, but is not specific to a single race," is belied by the

statement itself which focuses on relationships between white and African American officers.[1] (Appellee's Br. 17.)   The City's suggestion that the Committee on Race and Equality's report, which concluded "that the department has a growing racial problem," was exclusively concerned with gender issues is equally unavailing.  (CORE Report, R. 39-4, Page ID #1048.)

These instances of racial harassment, as well as a social media post denigrating Black Lives Matter protesters, may be considered in evaluating Plaintiff's hostile work environment claim even though none were directed at him.   It is well-established that incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may "contribute to a work environment that was hostile . . . ."  *Jackson v. Quanex Corp.* ("*Jackson-Quanex*"), 191 F.3d 647, 661 (6th Cir. 1999).

On appeal and in addition to the events specified in the complaint, Plaintiff contends that he was personally the subject of racial harassment outside of the January 22, 2017 incident. These other examples of direct harassment were not asserted in the district court, and this Court generally does not consider issues raised for the first time on appeal.  *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014).  However, even if this evidence is considered, Plaintiff still fails to demonstrate a hostile work environment.  He describes being ignored by certain white officers who were responsible for a number of racial social media posts and incidents with members of the public.   This Court has previously found that evidence of racially-based isolation can constitute harassment that supports a hostile workplace claim.  *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999).  He also identifies himself as one of the African American officers described in the CORE report who was denied desired shifts and training opportunities, as well as disrespected by white officers.

The City argues that other examples of harassment cited by Plaintiff should not be considered at all in evaluating his hostile work environment claim because they either took place

---

[1]The City's briefing presents an amended version of the assistant chief's comments that excises an explicit reference to race.  According to Plaintiff's deposition and a newspaper article on these statements, Assistant Chief Dolunt said, "Some whites don't like blacks, some blacks don't like whites, some men don't like women, and some women don't like blacks."  (News Article, R. 36-16, Page ID #945; Strickland Dep. R. 36-3, Page ID #760.)  In its brief, the City amends the comments to "some women don't like [men]."  (Appellee's Br. 15.)  The City made the same change before the district court.  *See Strickland*, 2019 WL 5737577, at * 7 n.3.

after Plaintiff filed this suit and amended complaint or because Plaintiff only learned of them in the context of this litigation.  The harassment challenged on these grounds includes: (1) the Snapchat video of officers mocking an African American motorist, which was first reported in January 2019; (2) another Snapchat post with an offensive caption from September 2018; (3) undated body camera footage of officers referring to African American members of the public as "Keishas" and "Homies"; and (4) the April 2019 Bennett affidavit indicating that issues in the Sixth Precinct had been observed throughout the Department by CORE.  In his reply brief, Plaintiff does not argue that this evidence should be considered, noting only that the Sixth Precinct Environmental Audit and Bennett affidavit were offered as corroboration for Plaintiff's claims and background information.  Accordingly, this Court will not consider the offensive Snapchat posts or body camera footage in evaluating Plaintiff's hostile workplace claim.  *See Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 329–30 (6th Cir. 2010) (holding that "district court correctly excluded evidence of discrimination that [a plaintiff] neither witnessed nor learned of outside the context of this litigation" in affirming summary judgment on hostile work environment claim).  Even if the videos were actionable in this suit, as the district court appeared to accept for the sake of argument, the Court would affirm its holding that the racial harassment for which Plaintiff provides evidence was not sufficiently severe or pervasive to survive summary judgment for the reasons explained below.  *See Strickland*, 2019 WL 5737577, at *8 (reviewing occurrences from 2015 to January 2019).

**2.  Whether the Harassment Created a Hostile Work Environment**

To proceed on his claim that the City maintained a hostile work environment, Plaintiff must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  The work environment must be both objectively and subjectively hostile.  These dual standards require "that the plaintiff not only perceived the work environment as hostile, but that a reasonable person would have found it hostile or abusive as well." *Smith*, 813 F.3d at 309 (citing *Harris*, 510 U.S. at 21–22).  The harassing conduct cannot be viewed in isolation, but "we must consider

the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). "Specifically, we must consider 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Id.* (alterations in original) (quoting *Harris*, 510 U.S. at 23).

Once the effects of the January 22, 2017 incident are put aside for purposes of Plaintiff's hostile workplace claim, he does not allege any physical invasion. This Court has held, following *Harris*, that "harassment involving 'an element of physical invasion' is more severe than harassing comments alone." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)).

As discussed above, incidents of harassment not directed at a plaintiff may be considered in evaluating a hostile work environment claim. *Meritor*, the Supreme Court case that first recognized such claims approvingly cited the Fifth Circuit's decision in *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *disapproved of on other grounds, EEOC v. Shell Oil Co.*, 466 U.S. 54, 62 n.11 (1984), which held that a "complainant could establish a Title VII violation by demonstrating that her employer created an offensive work environment for employees by giving discriminatory service to its Hispanic clientele." *Meritor*, 477 U.S. at 65–66. Nearly three decades later, the Supreme Court in *Vance v. Ball State University*, 570 U.S. 421, 426 (2013), continued to describe *Rogers* as a "leading case" for discriminatory work environment claims. Explicitly relying on *Rogers* and *Meritor*, this Court has held that a district court errs "when it deem[s] irrelevant the overwhelming evidence [the plaintiff] proffered documenting discriminatory conduct towards other African-American employees . . . ." *Jackson-Quanex*, 191 F.3d at 660.

We have also held, however, that if the conduct that forms the basis of a plaintiff's hostile work environment claim is not directed at that plaintiff, that fact "diminishes [its] severity." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009) (citing *Black*, 104 F.3d at 826). For example, in *Black*, "we emphasize[d] that [harassing] comments need not be directed

at a plaintiff in order to constitute conduct violating Title VII," but since most of the comments in that case had not been directed at the plaintiff, that "contribute[d] to our conclusion that the conduct . . . was not severe enough to create an objectively hostile environment." *Black*, 104 F.3d at 826. In contrast, "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009); *see also Abeita v. TransAmerica Mailings*, 159 F.3d 246, 249 n.4 (6th Cir. 1998) (recognizing that if there is no evidence that a plaintiff was aware of certain conduct, that conduct is irrelevant to the evaluation of a hostile work environment claim). Accordingly, the incidents of a colleague being called "boy" and the assistant chief dismissing racial tension, as well as online posts by Department personnel referring to residents of Detroit as garbage and characterizing Black Lives Matter supporters as racist terrorists, that were not directed at Plaintiff, but that there is evidence he was aware of during the period at issue, will be considered as evidence of a hostile work environment, but given less weight.

The evidence of personal discrimination that Plaintiff raises on appeal also does not require reversing the district court's dismissal of his hostile work environment claim. Plaintiff testified in his deposition that he tried to speak to notoriously racist officers Steele and Garrison and that they ignored him. While this Court has found that accounts of racial or gender isolation can support hostile workplace claims, those cases involved isolation of a different magnitude than Plaintiff's. In *Moore v. KUKA Welding Systems & Robot Corp.*, the "[p]laintiff testified that a couple of weeks after he filed the [EEOC] complaint, his supervisor and other employees began to avoid him and would not talk to him." *Moore*, 171 F.3d at 1078. The plaintiff's supervisor instructed other employees to move their equipment, so they would have no reason to go near the plaintiff, and also rearranged staffing so that the plaintiff was left as the only employee in his department. *Id.* Moore's isolation lasted for over a year until he quit. *Id.* Other cases where this Court has found isolation to constitute harassment supporting a hostile workplace claim have been characterized by similarly concerted and pervasive efforts to segregate the plaintiff from the rest of the workforce. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815–16 (6th Cir. 2013) (describing isolation of female employee from work, dining, and transportation); *Jordan v. City of Cleveland*, 464 F.3d 584, 589–90 (6th Cir. 2006)

(affirming denial of the defendant's Fed. R. Civ. P. 50 motion for judgment as a matter of law in part because African American plaintiff had experienced "general isolation").

Plaintiff's contention that the limited number of incidents of racial harassment he cites is remedied by general allegations that he has experienced disrespect throughout his tenure as a police officer is unavailing. This Court has held that "[m]ere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus." *Khalaf*, 973 F.3d at 484 (citing *Oncale*, 523 U.S. at 80); *see Phillips v. UAW Int'l*, 854 F.3d 323, 325 (6th Cir. 2017) (affirming grant of summary judgment on racially hostile work environment claim where the plaintiff presented evidence of "a smattering of offensive conduct," general allegations of violent behavior, "frequent racial comments," and the use of a condescending tone when speaking with African American union members).

Considering Plaintiff's evidence of racial harassment under the totality of the circumstances, he has not demonstrated a genuine factual dispute as to whether the harassment was sufficiently severe or pervasive to alter the conditions of his employment. He has provided evidence of approximately five incidents of racial harassment over more than ten years. This is not frequent conduct. *See Smith*, 813 F.3d at 310–11 (finding frequency of conduct when evidence of four incidents over six months). Moreover, most of the harassing conduct was in the form of online posts or comments directed at others. This Court's precedents require that such conduct be afforded less weight in the hostile work environment analysis because of its non-physical and non-direct nature. Accordingly, the district court did not err in granting summary judgment to the City on Plaintiff's hostile work environment claim. *See Phillips*, 854 F.3d at 328 ("The misconduct alleged here—a handful of offensive comments and an offensive meeting over a two-year period—does not" add up "to actionable discriminatory conduct under a hostile work environment theory.").

## C. Excessive Force Claim

Plaintiff appeals the district court's grant of summary judgment to Officer Schimeck on his excessive force claim based on tight handcuffing. The district court erred in dismissing this claim and granting qualified immunity to Officer Schimeck.

In evaluating whether Officer Schimeck was entitled to qualified immunity on Plaintiff's § 1983 claim, we must determine "(1) whether, considering the [facts] in a light most favorable to the injured party, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012) (citations omitted). At issue here is Plaintiff's clearly established right to be free "from excessively forceful or unduly tight handcuffing . . . ." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). Defendants do not dispute that this right was clearly established as of January 22, 2017, only whether it was violated in this case. *See Ouza v. City of Dearborn Heights,* 969 F.3d 265, 271, 278 (6th Cir. 2020) (finding right to be free of excessive handcuffing clearly established by December 2014).

For his excessive handcuffing claim to survive summary judgment, Plaintiff must point to evidence that (1) he complained the handcuffs were too tight; (2) Officer Schimeck ignored his complaint; and (3) he experienced "some physical injury" resulting from the handcuffing. *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). The parties in this case dispute only the second element.

There is a genuine dispute of fact as to whether Officer Schimeck ignored Plaintiff's complaint that his handcuffs were too tight. Plaintiff testified in his deposition that "[w]hen I told [Officer Schimeck] the cuffs were too tight, there wasn't a response." (Strickland Dep., R. 36-3, Page ID #769.) The district court recognized "there is some question of fact as to how Defendant Schimeck responded to Plaintiff's complaint that the handcuffs hurt . . . ." *Strickland*, 2019 WL 5737577, at *14. Qualified immunity should have been denied on that basis. However, the district court went on to observe that the disputed fact as to how Officer Schimeck responded to Plaintiff's complaint was not material because "the issue was ultimately addressed: Plaintiff's handcuffs were loosened and locked into place by Schimeck's partner, and they were ultimately removed upon Plaintiff giving notice to Bliss that they were too tight." *Id.* It concluded that "Plaintiff's complaints were not ignored" because someone eventually loosened his handcuffs. *Id.*

Officer Schimeck is not immune from suit because it is a disputed fact whether she ignored Plaintiff's complaint of excessively tight handcuffs. Granting summary judgment because Plaintiff's handcuffs were loosened at some later point by someone else was not appropriate. Our decision in *Baynes v. Cleland* provides much guidance. In *Baynes*, we reversed a district court's grant of qualified immunity to sheriff's deputies who had ignored the plaintiff's complaints that his handcuffs were too tight. The analysis of the excessive force claim against Deputy Brandon Cleland is particularly instructive. Like Officer Schimeck, Deputy Cleland did not actually handcuff the plaintiff, instead another officer did so. *Baynes*, 799 F.3d at 604. As with Officer Schimeck, Deputy Cleland took custody of the plaintiff after the handcuffing, and there was evidence that he ignored complaints that the handcuffs were too tight. *Id.* And just like Officer Schimeck, another law enforcement officer removed the plaintiff's handcuffs sometime after the complaints had been made to Deputy Cleland. *Id.* In *Baynes*, this was enough for us to conclude that the district court had erred in granting Deputy Cleland qualified immunity on the plaintiff's excessive force claim based on tight handcuffing. *Id.* at 617. And the same result is required here. Qualified immunity is inappropriate just because another officer eventually loosens and removes a plaintiff's handcuffs.

Our decision in *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), is not, as Defendants contend, to the contrary. In *Burchett*, the plaintiff was handcuffed after ignoring an officer's command to get on the ground, opting to flee instead. *Burchett*, 310 F.3d at 940. Afterwards, the plaintiff was placed in a police car while the officers executed a search warrant at a nearby home. *Id.* All agreed that it was a hot day, and the plaintiff requested that the officers roll down the windows of the vehicle. *Id.* His request was denied. *Id.* There was no evidence in *Burchett* that the plaintiff complained to the officers about the handcuffs, however, until he showed his family his swollen and discolored hands. *Id.* at 941. Burchett's daughter alerted Sheriff Greg Kiefer to the issue, who after obtaining the plaintiff's agreement to behave, let him out of the vehicle and removed the handcuffs. *Id.* Accordingly, we concluded that "Kiefer's prompt response when Burchett finally did complain distinguishes this case from those in which we found constitutional violations." *Id.* at 945. Unlike *Baynes* and this case, there was no evidence that a complaint about handcuffs being too tight was ignored in *Burchett*.

### D.  Retaliation Claim

Plaintiff testified that he was disciplined and suspended for three days in retaliation for filing a complaint about the January 22, 2017 incident.  The district court dismissed Plaintiff's retaliation claim after finding that he had not provided any evidence that the asserted reason for his discipline—that he had violated rules and regulations of the Department—was pretextual.  *Strickland*, 2019 WL 5737577, at *13.  The City says that this is correct and that Plaintiff also failed to meet his burden of establishing a prima facie case of retaliation.  For the reasons that follow, we find that the district court correctly found that Plaintiff established a prima facie case of retaliation, but erred in concluding that he presented no evidence that the City's discipline was pretextual.  We reverse the district court's grant of summary judgment on this claim.

### 1.  Statutory Requirements

At oral argument, counsel for Defendants argued for the first time that this cause of action should be dismissed because Plaintiff had not filed a retaliation claim in his EEOC charge, but had only presented allegations of racial discrimination to the federal agency.  This argument is squarely foreclosed by the Supreme Court's recent decision in *Fort Bend County v. Davis*, 139 S. Ct. 1843 (2019).  In that case, the defendant asserted for the first time on remand to the district court that there was no subject matter jurisdiction over the plaintiff's religious discrimination claim because the claim was not stated in her EEOC charge.  *Id.* at 1848.  The district court granted the motion, finding the charge-filing requirement was jurisdictional.  *Id.* The Fifth Circuit reversed, holding that the charge-filing requirement was not jurisdictional, but a claim-processing rule, and that by waiting to raise the argument after years of litigation, the defendant had forfeited the argument.  *Id.*  The Supreme Court affirmed.  As this Court has recognized, "the Supreme Court [in *Fort Bend County*] ultimately left this Court's prior rulings in place, maintaining that the administrative exhaustion requirement is a claim processing rule and therefore is 'subject to forfeiture' by the defendant."  *George*, 966 F.3d at 469 (quoting *Fort Bend Cnty.*, 139 S. Ct. at 1851–52).  Defendants' contention that this Court should dismiss Plaintiff's retaliation claim because he failed to file it with the EEOC is forfeited.

However, the Court dismisses Plaintiff's Title VII retaliation claim against Sergeant Wilson, the lead internal affairs investigator.  Although this issue was not raised by the parties or addressed by the district court, it is well-established that only employers, and not individuals in their personal capacity, can be held liable under Title VII.  *See Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

### 2. *McDonnell Douglas* Burden-Shifting Analysis

Since Plaintiff seeks to prove retaliation through circumstantial evidence, his claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing his prima facie case of retaliation.  *Id.* at 802; *accord Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981).  If this threshold is met, then a defendant is required to "articulate some legitimate, non-discriminatory reason for its actions."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).  If the defendant meets this burden of production, then a plaintiff may still succeed on a claim if he can demonstrate the proffered reason was not the actual reason for the adverse employment decision.  *Id.*

Because the City challenges Plaintiff's retaliation claim at the first step of the *McDonnell Douglas* framework—the prima facie case—our analysis begins there.

### a.  Prima Facie Case

To establish a prima facie case of retaliation under Title VII, Plaintiff must show that "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."  *Id.* (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)).  In this case, the City acknowledges that the Department's disciplining of Plaintiff constituted an adverse action.  It also does not challenge the district court's conclusion that the officials responsible for that adverse employment action knew of Plaintiff's allegedly protected activity.  *Strickland*, 2019 WL 5737577, at *11.

Plaintiff's retaliation claim arises from Title VII's so-called "opposition clause," which prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a); *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009). Specifically, Plaintiff claims that he opposed unlawful racial discrimination when he complained to the Department's Equal Employment Opportunity ("EEO") office about the January 22, 2017 incident. In that complaint, Plaintiff indicated that he believed his mistreatment constituted discrimination based on race by checking the corresponding box.

On appeal, the City argues that Plaintiff did not engage in activity protected by Title VII. It contends that checking a box for racial discrimination is insufficient to render Plaintiff's EEO complaint protected activity under Title VII when the body of the complaint does not mention race. The City's reliance on this Court's unpublished decision in *Bray v. Palm Beach Co.*, 907 F.2d 150 (6th Cir. 1990) (table) (per curiam), in support of this proposition is inapposite. In *Bray*, the plaintiff filed a charge with the EEOC that she had been denied a promotion as retaliation for having filed discrimination charges against the defendant. However, her federal suit alleged that she had been discriminated against on the basis of sex. This Court agreed with the plaintiff "that the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge." 907 F.2d 150, at *2 (citation omitted). *Bray* is distinguishable because neither the box nor the body of the EEOC charge indicated that the plaintiff believed her mistreatment had been due to sex, rather than in retaliation for her previous discrimination complaints. In this case, the district court properly concluded that by marking the box for discrimination based on race, there was evidence that Plaintiff had engaged in activity protected under Title VII by opposing racial discrimination in employment. *Strickland*, 2019 WL 5737577, at *10.

The City also contends in a conclusory fashion that Plaintiff has failed to establish causation, the final element of the prima facie retaliation case. No analysis or evidence is offered on appeal in support of reversing the district court's conclusion that Plaintiff demonstrated the requisite connection between his protected activity and the adverse employment action. *See id.* at *11–*12. Accordingly, this argument is waived. *See United States v. Layne*, 192 F.3d 556,

566–67 (6th Cir. 1999) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))).

However, even if this argument had not been waived, there is ample evidence in the record of causation for Plaintiff to establish the final element of his prima facie case. The requirement to demonstrate "but-for" causation "is not onerous" and may be satisfied through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted). Both these factors are present here. Plaintiff testified that Officer Murdock was required to complete an activity log, but was not disciplined for neglect of duty as Plaintiff was. Additionally, Plaintiff was charged with his disciplinary infractions on April 3, 2017, which was less than three months after Plaintiff complained about the January 22, 2017 incident. The investigation was assigned to Sergeant Wilson on January 27, 2017, three days after Plaintiff "reported to the Human Resources Bureau and prepared a Charge of Discrimination/Harassment Report with Ms. Alethea Johnson, Equal Employment Opportunity Coordinator." (Internal Affairs Report, R. 36-7, Page ID #858.) The fact that Plaintiff became the subject of investigation shortly after filing his internal complaint is further evidence that Plaintiff's protected activity caused his discipline. *See Randolph*, 453 F.3d at 737 (reversing grant of summary judgment on retaliation claim in part because the plaintiff was investigated for misconduct after reporting workplace harassment).

### b. Pretext

The City met its burden to articulate a legitimate, non-retaliatory basis for Plaintiff's discipline. It claims that Plaintiff was suspended for violating various Department regulations. Violation of work rules constitutes a legitimate, non-retaliatory basis for the City's actions. *See Romans v. Michigan Dep't of Hum. Servs.*, 668 F.3d 826, 839 (6th Cir. 2012).

Because the City has discharged its burden, Plaintiff must show that the proffered justification "is not the real reason" he was disciplined. *George*, 966 F.3d at 462. "This burden is not heavy, though, as summary judgment is warranted only if no reasonable juror could

conclude that the employer's offered reason was pretextual." *Id.* (citations omitted). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (footnote omitted) (citation omitted).

Most of the evidence offered by Plaintiff fails to meet these standards. First, he seeks to justify his failure to follow Sergeant Ballinger's orders on January 22, 2017 by pointing out that none of the officers identified themselves and their uniforms were obscured by a thick fog. However, Plaintiff was not charged by internal affairs for his conduct at that time. Moreover, Plaintiff's explanation does not demonstrate that Sergeant Wilson's conclusion that his conduct was improper had no basis in fact. So too for Plaintiff's explanation of the abuse of authority and withholding of information charges. Plaintiff contends he did not abuse his authority in obtaining video of the incident from the gas station because he initially asked the gas station attendant for the video while he was in plain clothes. This may very well be true, but Plaintiff was not disciplined for this request. Rather he was charged for two return trips to the gas station, including once while in uniform and a marked police vehicle. Plaintiff defends himself against the charge that he withheld the video evidence from the Department by observing that he was a union steward. Again, this fact does nothing to show that the Department's charge that Plaintiff withheld information relating to an ongoing criminal investigation had no basis in fact. "[A] case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds" for the adverse employment action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). But that is precisely what Plaintiff attempts to do here.

The district court erred, however, in rejecting Plaintiff's third argument—that the legitimate, non-retaliatory reason for his discipline was pretextual because another officer, Murdock, had committed the same infraction as he did, but was not investigated or disciplined. Demonstrating pretext often consists of "raising the question of why [the plaintiff] was singled out" for an adverse employment action. *George*, 966 F.3d at 462. Strickland testified that he and Officer Murdock engaged in the same misconduct, failing to complete an activity log, and while Plaintiff was suspended in part for that conduct, Officer Murdock was not investigated or

charged.  The district court rejected this comparison, observing that "Murdock was in a different precinct, and position, than Plaintiff, and the underlying events on which Plaintiff bases his argument, were different."  *Strickland*, 2019 WL 5737577, at *12.  Plaintiff testified that such differences were immaterial, stating:  "Any time you [are] working as a police officer you have to complete an activity log when you conduct activity."  (Strickland Dep., R. 36-3, Page ID #782.) The district court appears to have disregarded this testimony as Plaintiff's "own opinion . . . ." *Strickland*, 2019 WL 5737577, at *12.  Such an adverse credibility determination and weighing of Plaintiff's testimony is inappropriate on summary judgment when a court must view "the evidence in the light most favorable to the party opposing the motion."  *Kirilenko-Ison*, 974 F.3d at 660.

The dissent would affirm the district court and concludes that Plaintiff and Officer Murdock were not similarly situated due to their different positions, reporting regulations, and conduct.  However, there is no evidence or claim by the City that these distinctions were in fact relevant to the Department's disciplinary decisions.  *See Jackson v. FedEx Corp. Servs.*, 518 F.3d 388, 394 (6th Cir. 2008) (recognizing "that the appropriate test is to look at those factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity in all respects").  The dissent's determination relies on weighing of facts, drawing inferences in favor of the City, and resolving questions of credibility.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" on summary judgment. *Anderson*, 477 U.S. at 255.

For example, rather than crediting Plaintiff's testimony that all police officers were required to complete activity logs, the dissent relies on Officer Murdock's statement that he did not maintain an activity log because "[n]ormally when we get recalled we did not do activity logs.  That has since changed and we do now."  (Murdock Dep., R. 36-8, Page ID #899.)  As an initial matter, it is unclear to whom Officer Murdock was referring when he said that "we" did not complete activity logs; it could be the K-9 bomb squad, the bomb squad more generally, or even the entire Detroit Police Department, all working groups that Officer Murdock testified he was a member of during his deposition and in the context of discussing his activity log practices.

Regardless of the resolution of that issue, on the reading of Officer Murdock's testimony most generous to Plaintiff, as is appropriate on a motion for summary judgment, there is no apparent conflict between Plaintiff's declaration that all police officers are required to complete activity logs and Officer Murdock's statements. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (recognizing that all permissible inferences from the evidence are to be drawn in favor of party opposing summary judgment). Officer Murdock's testimony that he normally did not complete an activity log does not necessarily contradict Plaintiff's testimony that all police officers were formally required to do so. Drawing all inferences in Plaintiff's favor requires us to conclude that Officer Murdock was required to complete an activity log, just as Plaintiff was, in January 2017. Moreover, even if Officer Murdock's testimony did contradict Plaintiff's declaration that all police officers were required to complete activity logs, summary judgment would still not be appropriate. "The evidence of the non-movant is to be believed . . . ." *Anderson*, 477 U.S. at 255. For example, in *George*, the defendants offered testimony that the plaintiff was fired for administrative rather than retaliatory reasons, but we found that "on summary judgment, we cannot weigh which of these stories is more credible—so long as a reasonable juror could credit George's evidence and not Defendants', the case must proceed to a trial." *George*, 966 F.3d at 462. We are similarly required to credit Plaintiff's account in this case as well.

Accordingly, there is a genuine dispute of material fact as to whether the differences in position and applicable regulations justify the differential treatment that Plaintiff and Officer Murdock received for not completing an activity log. "[I]nasmuch as the explanations do not rationally explain the difference, . . . a jury could reasonably reject the stated reasons and find that the difference in treatment was instead motivated by" a desire to retaliate against Plaintiff for complaining about racial discrimination. *Redlin v. Gross Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). This Court has long held that evidence of such unjustified differential treatment is sufficient "to withstand summary judgment on the issue of pretext" and is itself evidence that the "proffered explanation . . . may not have actually motivated [the employer's] conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1023 (6th Cir. 2000). Specifically, this Court has recognized that "showing that a similarly situated employee outside the protected class committed the same misconduct but was not subject to the same consequences—and insinuating

that the reason for that disparate treatment is" retaliation may support a finding of pretext. *Miles v. S. Cen. Hum. Res. Agency, Inc.*, 946 F.3d 883, 892 (6th Cir. 2020).

The dissent also argues that not only were Plaintiff and Officer Murdock differently positioned, but that they did not commit the same misconduct. It emphasizes that while Plaintiff improperly completed his activity log, Officer Murdock did not complete one at all. But this analysis requires making an inference in the City's favor since the City did not appear to make this argument either before the district court or on appeal, and there is no indication in the record that the Department viewed or treated incomplete and entirely omitted activity logs any differently. This distinguishes the facts here from the cases cited by the dissent. For example, in *Miles*, the plaintiff "was responsible for the mismanagement of two programs, rather than just one," like her proposed comparators. *Miles*, 946 F.3d at 894. Thus, by any metric, her misconduct was more severe than those with whom she sought to associate, justifying differential treatment on that basis alone. On the other hand, it is not immediately apparent whether omitting certain information from an activity log is more severe misconduct than entirely failing to file one. *See Jackson-VHS*, 814 F.3d at 781 (finding that "speculating on the likelihood and relative severity of" the harm that might have resulted from misconduct by a plaintiff and a proposed comparator "is a task better suited to a jury").

Contrary to the dissent, our decision in *Seay v. Tennessee Valley Authority*, 339 F.3d 454 (6th Cir. 2003), also does not support a determination that Plaintiff's conduct was relevantly different than Officer Murdock's. As relevant here, in *Seay*, the plaintiff, an African American man, claimed he was treated differently than similarly situated white employees who also violated the defendant's vehicle use policy. For the most part, we disagreed. The defendant's investigation determined that two of the proposed comparators who had misused vehicles had received permission to do so from their supervisors, which was a relevant fact because it meant their violations of the policy were not willful like the plaintiff's. *Id.* at 479. Another white employee who received a suspension half the length of the plaintiff's was determined not to be similarly situated because he only violated the vehicle policy once, whereas the plaintiff had violated it twice. *Id.* Accordingly, there was evidence in the record in *Seay* as to why the distinctions in conduct were relevant to differential discipline. That is not the case here.

Moreover, even if the distinction between omission and misrepresentation with respect to an officer's activity log was relevant to Department disciplinary procedures, it is not at all clear it would apply in this case. Plaintiff was formally charged with "fail[ing] to properly document all activity thoroughly and completely on his activity log including his reviewing of video footage at the BP Gas Station . . . ." (Internal Affairs Report, R. 36-7, Page ID #892.) This suggests that Plaintiff was disciplined for an omission from his activity log, not "lying," as the dissent concludes. The failure to document all his activity completely is the same infraction Plaintiff has offered evidence that Officer Murdock committed.

Plaintiff has provided evidence "that [he] is similar to [his] proposed comparator in 'all relevant respects.'" *Miles*, 946 F.3d. at 893 (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). "Where Plaintiff has presented no other evidence, . . . Plaintiff's testimony [may be] sufficient to defeat Defendant's motion to dismiss," contrary to the dissent's suggestion to the contrary. *Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015). But even if that were not the law of our Circuit, the dissent's characterization of a "thin presentation" by Plaintiff is not supported by the cases it cites. Unlike the unpublished decision in *Clark v. Walgreen Co.*, 424 F. App'x 467 (6th Cir. 2011) (per curiam), it is not the case that Plaintiff's "only evidence that other[s] . . . engaged in similar misconduct is [Plaintiff's] own testimony." *Clark*, 424 F. App'x at 474. Here, there is no dispute, and Officer Murdock testified that he did not keep an activity log for the January 22, 2017 incident. We also point out that Officer Murdock's deposition testimony that he did not normally keep an activity log took up a total of nineteen words. That is the exact same quantum of evidence that the dissent finds insufficient to create a genuine dispute of material fact based on Plaintiff's testimony.

Plaintiff was disciplined because he was a police officer and required to document his activity in an activity log, and there is evidence in the record that Officer Murdock was exactly the same, except that he was not even investigated. *Cf. Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 531 (6th Cir. 2020) (affirming grant of summary judgment on retaliation claim when the plaintiff failed to specifically identify any other similarly situated employees, the defendant offered evidence that no other employee engaged in similar conduct during the time

period in question, and demonstrated that other employees who engaged in similar misconduct as the plaintiff were terminated). Plaintiff has demonstrated a genuine issue of material fact as to whether the proffered reason for his discipline actually motivated the City's conduct. Therefore, the City is not entitled to summary judgment on his Title VII retaliation claim.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of the City on Plaintiff's hostile work environment claim under Title VII. We **REVERSE** the district court's grant of qualified immunity to Officer Schimeck on Plaintiff's excessive force claim and **REVERSE** the district court's grant of summary judgment in favor of the City on Plaintiff's retaliation claim under Title VII. We **REMAND** the case for further proceedings consistent with this opinion.

---

### CONCURRENCE

---

JULIA SMITH GIBBONS, Concurring.   I join the lead opinion in full but write separately to emphasize the primary reason that Strickland's hostile work environment claim fails.

An individual may bring a hostile work environment claim under Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. Gen. Motors Corp*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[1]  "The plaintiff must also prove that his employer 'tolerated or condoned the situation,' or knew or should have known of the alleged conduct and did nothing to correct the situation." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999)). The standard does not depend on the number of racist or discriminatory instances, but rather on whether the harassment is "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that the victim subjectively regarded it as abusive." *Id.*

Most importantly for the purposes of this case, while not all discriminatory or racist remarks need to have been directed at the plaintiff, it is difficult to sustain a claim where the *majority* of the complained of conduct was directed at other individuals or was general, meaning that it was not directed at anyone in particular.  *See id.* ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [the plaintiff]"); *see also Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).  The lead opinion is correct that "incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may 'contribute to a work environment that was hostile,'" and

---

[1]This case concerned sexual harassment, but because "the same principles that govern sexual harassment also govern claims of racial harassment," the standard laid out applies in this instant case. *Jackson* 191 F.3d at 658 (citing *Risinger v. Ohio Bureau of Workers' Comp.*, 883 F.3d 475, 479 (6th Cir. 1989)).

therefore the lead opinion did not err in considering these incidents.  Maj. Op., at 10 (quoting *Jackson*, 191 F.3d at 661).  I believe that these incidents are so far removed from Strickland's experience, and he has such scant evidence of discrimination actually directed at him, that his attempts to employ them in his own case are of scant evidentiary value.

As a preliminary matter, it is important to separate the alleged facts that are directly relevant to Strickland's experience in his workplace from the facts that he did not himself experience and that did not occur in his presence or even in his precinct.

Strickland makes the following allegations of direct racial harassment and discrimination. The department denied him desirable shift assignments and trainings that were given to white officers.[2]  He worked with two other officers, Gary Steele and Michael Garrison, who "wouldn't speak to [him]" despite his attempts to engage with them, and who "would just walk past [him] as if [he] never said anything to them."  DE36-3, Strickland Dep. Tr., Page ID 773.  He witnessed white supervisors disrespecting black officers and experienced such disrespect himself.  Strickland also urges the court to find that the incident on January 22, 2017 at the gas station contributed to the racially hostile work environment.  However, as the lead opinion aptly explains, Strickland failed to create a fact issue as to whether that incident was racial harassment.

On the other hand, Strickland describes conduct that, while clearly inappropriate and even repugnant, was not directed at him or of which he was not even aware.  Department employees "used social media to communicate racist, racially coded and demeaning messages." DE36-15, EEO Not., Page ID 939.  He gives several examples of such social media posts, and undoubtedly they are racist.  For example, one post said that "[t]he only racists here are piece of shit [B]lack Lives Matter terrorists and their supporters[.]"  *Id.*  Another described Detroit's decision to end the requirement that police officers live within the city as "the best thing that ever happened to the Detroit Police" because "[w]e have to police the garbage but you can't make us live in the garbage."  *Id.*  Strickland concedes that these posts were not directed at him. Additionally, Strickland describes a time that a white officer called a co-worker "boy."  DE36-3, Strickland Dep. Tr., Page ID 752.  The same two officers that reportedly intentionally ignored

---

[2]This assertion is more appropriately characterized as a race discrimination claim, but Strickland views it as part of his hostile environment claim.  He offers only his own conclusory testimony on this point.

Strickland, Steele and Garrison, are shown in bodycam footage calling African Americans women "Keishas."  DE39-2, 6th Precinct Environmental Audit, Page ID 1030.  Strickland submits two reports describing the environment within the police department: The Committee on Racial Equality Report (CORE) Report and the Sixth Precinct Environmental Audit.  Police Chief James Craig established CORE to assess the racial climate within the entire department. DE39-4, CORE Report, Page ID 1047.  Craig also called for the Environmental Audit specific to the Sixth Precinct in response to media reports about racial misconduct in that precinct. However, Strickland does not allege that he actually *experienced* the racism and discrimination detailed in these reports.  In fact, Strickland has never worked in the Sixth Precinct, and the report specifically concluded that "the racial division" within the Sixth Precinct "does not appear to be widespread throughout the entire precinct."  DE39-2, Sixth Precinct Environmental Report, Page ID 1030.  And Strickland has not offered evidence that the Sixth Precinct's racial issues affected him.

It is not difficult to conclude that there is racism within the Detroit Police Department.  It does not follow, however, that Strickland himself experienced a severe or pervasive racially hostile work environment.  The lack of evidence on this point requires that we affirm the district court's grant of summary judgment as to Strickland's Title VII claim.

In *Bowman v. Shawnee State University* this court held that five instances of harassment did not constitute severe or pervasive conduct.  220 F.3d 456, 464−65 (6th Cir. 2000).  In *Smith.*, we held that a racial slur directed at the plaintiff, combined with a racist cartoon circulated around the workplace and a different racial slur directed at another employee, was not severe or pervasive.  220 F.3d at 759−60.  In *Kelly v. Senior Centers., Inc.*, we held that use of a pejorative slur to refer to individuals other than the plaintiff, a description of a Black board member as a "token black," and racist jokes were abhorrent, but insufficient.  169 F. App'x 423, 429 (6th Cir. 2006).   These cases are similar to Strickland's in that, while the plaintiffs undoubtedly experienced some discrimination firsthand, it did not rise to the level of severe or pervasive, and much of the discrimination that they allege was directed at other individuals.  The officers' social media posts were not about Strickland; indeed we cannot even be sure how or when Strickland learned of them.  The district court concluded that "[t]here is no evidence that [Strickland]

witnessed nor learned of" some of the cited "occurrences outside the context of this litigation," because the social media posts did not surface until after the suit was initiated. *Strickland v. City of Detroit*, No. 18-12640, 2019 WL 5737577, at *6 (E.D. Mich. Nov. 5, 2019). The lead opinion correctly declines to consider them for the same reasons. I also believe that even if Strickland had been aware of these instances before litigation, they do not support a claim that he himself experienced a hostile work environment. Moreover, Strickland himself was not called "boy," or "Keisha." DE36-3, Strickland Dep. Tr., Page ID 752; DE39-2, 6th Precinct Environmental Audit, Page ID 1030. While the CORE Report and Environmental Audit paint an ugly picture of the Detroit Police Department, Strickland does not claim to have experienced firsthand the racism that they describe other than being denied preferential shifts.

In sum, being denied shifts and being ignored by his white coworkers simply does not suggest a severe or pervasive racially hostile work environment. I therefore concur with the lead opinion affirming the district court on the hostile work environment claim.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.  I agree with the lead opinion's disposition of the hostile workplace and excessive force claims.  I disagree on the retaliation claim's ultimate outcome.[1]  I think the neglect of duty charge was proper because Plaintiff and Officer Murdock were not similarly situated.  "Without similarly situated parties, we cannot adjudge the intent of the employer as to retaliation."  *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 503 (6th Cir. 2009).

"'[T]he plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects' in order for the two to be similarly-situated."  *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  "In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct."  *Id.* (citing *Ercegovich*, 154 F.3d at 352).  We can consider anything relevant in a given case.  *Id.*

The majority concludes that Officer Murdock and Plaintiff were similarly situated.  "Plaintiff was disciplined because he was a police officer and required to document his activity in an activity log, and there is evidence in the record that Officer Murdock was exactly the same, except that he was not even investigated."  (Maj. Op. at 24.)

But the two are not "exactly the same."  At least three relevant distinctions are in play here.  As the district court noted, Plaintiff and Officer Murdock held different positions within the Department.  *See Strickland v. City of Detroit*, No. 18-12640, 2019 WL 5737577, at *12 (E.D. Mich. Nov. 5, 2019).  As Officer Murdock testified, he wasn't required to fill out an activity log like Plaintiff was.  And, as the record makes clear, the two did not engage in identical conduct.

---

[1]I join the majority's resolution of the abuse of office and withholding information charges.

Plaintiff was a field training officer when the handcuffing incident occurred. In his deposition, he testified that "[a]ny time you [are] working as a police officer you have to complete an activity log when you conduct activity." (R.36-3, Strickland Dep., PID#782.) Given this understanding, Plaintiff felt the Department should've investigated Officer Murdock, "who didn't complete an activity log" and "wasn't charged with anything." (*Id.*) Plaintiff maintained that Officer Murdock "should have been charged with [neglect of duty]." (*Id.*)

Officer Murdock, however, was not a field training officer. He was on the bomb squad. And on the morning of the incident, the Department recalled him to the gas station to examine the grenade. At that time, bomb squad officers did not have to complete activity logs for work performed when recalled. (*See* R.36-8, Murdock Dep., PID#899 ("Normally when we get recalled we did not do activity logs. That since has changed and we do now.").)[2]

But let's assume, as the majority posits, that Officer Murdock's testimony is ambiguous and perhaps refers to the entire Detroit Police Department. (*See* Maj. Op. at 21–22.) This still doesn't make Officer Murdock and Plaintiff similarly situated. If nobody in the Detroit Police Department had to complete activity logs when they were recalled, then Officer Murdock didn't have to complete an activity log after getting recalled. Plaintiff, on the other hand, improperly completed his activity log for a scheduled shift. (*See* R.36-7, Internal Affs. Rep., at PID#884, 886.) This differently situates Plaintiff and Officer Murdock.

---

[2]The majority claims Officer Murdock's testimony may have been referring to "the K-9 bomb squad, the bomb squad more generally, or even the entire Detroit Police Department." (Maj. Op. at 21.) This is a stretch. Officer Murdock had been recalled "on a report of a hand grenade strapped to a gas pump." (R.36-8, Murdock Dep., PID#897.) He left the scene after telling his superior officer that he "had handled the grenade," "didn't find anything else," and "was going to leave." (*Id.* at PID#900.) Read in context, it's clear that Officer Murdock was testifying as a bomb squad officer.

His responses to the two questions immediately following his statement about activity logs confirm as much. When asked whether the gas station was secure, he said "[m]ost of our scenes are quite impossible to contain because of the threat," which "[w]e don't want to be right on top of." (*Id.* at #899.) And then he explained the "best practices" specific to gas stations. Bomb squad officers try to "keep the attendant inside in a safe area away from windows, in case something goes bad [and] he ha[s] to dump the pumps." (*Id.*) It would be odd if, for only the two questions important here, Officer Murdock had switched his vantage point from that of a bomb squad officer to that of any Detroit police officer.

Plus, the litigants understood Officer Murdock to be testifying as a member of the bomb squad and not as a member of the police department more broadly. The question that provoked Plaintiff's blanket response was, "Do you know if Officer Murdock's unit requires an activity log?" (R.36-3, Strickland Dep., PID#782.)

One more thing. Plaintiff lied in his activity log; Officer Murdock merely failed to complete one. Plaintiff wrote that he was working at the Joe Louis Arena when in fact security cameras caught him at the gas station. (*See id.* at PID#884–86.) The Department discovered this inconsistency during its investigation and considered it important enough to ask Plaintiff about during his interview. (*See id.* at PID#886.) Officer Murdock simply never completed a log.

For me, these differences explain the Department's differential treatment. "Pretext is a commonsense inquiry: did the employer [discipline] the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). The Department disciplined Plaintiff for "fail[ing] to properly document all activity thoroughly and completely on his activity log" while "on duty." (R.36-7, Internal Affs. Rep., PID#892.) Officer Murdock testified that he didn't have a similar responsibility because of his different position and his having been recalled to the scene. Even if he did, the Department could have reasonably decided that the mere failure to complete an activity log didn't warrant investigation and discipline although falsifying an activity log did. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893–95 (6th Cir. 2020) (concluding that where a Title VII plaintiff's proposed comparators "were held to a different standard of conduct," "obligated to perform different functions," and "engaged in much more passive misconduct" the parties had not been engaged in "substantially identical conduct") (cleaned up); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 478–79 (6th Cir. 2003) (concluding that a plaintiff was not similarly situated to some of his proposed comparators where, even though they had all violated the same rule, the comparators' "violations differ[ed] in relevant respects from the facts surrounding Plaintiff's violation").

The majority chides me for observing the ways in which Plaintiff and Officer Murdock are differently situated because "there is no indication in the record that the Department viewed or treated incomplete and or entirely omitted activity logs any differently." (Maj. Op. at 23.) But we've repeatedly held that, "a plaintiff cannot establish a reasonable inference of [retaliatory] motive based on her 'employer's more severe treatment of more egregious circumstances.'" *Jackson v. VHS Detroit Receiving Hosp.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002)). And employers enjoy considerable latitude when deciding exactly what makes some circumstances "more egregious"

than others. *See Ladd*, 552 F.3d at 503 (rejecting proposed comparator where the employer deemed plaintiff's falsification of a document to be "serious" but not her proposed comparator's violations of safety rules); *Klepsky v. United Parcel Serv.*, 489 F.3d 264, 272–73 (6th Cir. 2007) (finding that the omission of relevant medical history and the forgery of another employee's signature were "not sufficiently similar to raise an implication of pretext" "although both involved dishonesty"); *Clayton*, 281 F.3d at 612 (rejecting proposed comparators who had "engaged in the same acts of negligence" after considering "the harm resulting from [plaintiff's] conduct").

How does the Department's discretion "to treat differently-situated parties differently" map onto our facts? *Ladd*, 552 F.3d at 503. Let's assume Plaintiff and Officer Murdock had identically violated the Department's rules and held the same job subject to the same reporting requirements. Even then, the circumstances surrounding their charges would still be distinct in at least two meaningful ways. First, Plaintiff's fabrication of his activity log facilitated his other two violations. Without the cover story of being at his scheduled assignment, perhaps Plaintiff never returns to the gas station in full uniform to make a copy of the tape. And so the consequences of Plaintiff's misrepresentation—additional violations of the Department's rules—can justify differential discipline. *See Clayton*, 281 F.3d at 612. Nothing like this came of Officer Murdock's alleged violation.

Second, Plaintiff committed three violations; Officer Murdock arguably had one. Even if their conduct, roles, and reporting requirements had been identical, this differently situated them. *Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001); *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730–31 (6th Cir. 1999). This is, after all, the same kind of rote counting that the majority finds persuasive in its efforts to distinguish *Miles* and *Seay* from our facts. (*See* Maj. Op. at 23.) "Thus, by any metric, [Plaintiff's] misconduct was more severe than [Officer Murdock's], *justifying differential treatment on that basis alone*." (*Id.* (emphasis added).)

In any event, getting bogged down in all this minutiae risks losing the thread. Remember, "[p]retext is a commonsense inquiry." *Chen*, 580 F.3d at 400 n.4. Plaintiff and his proposed comparator worked different jobs, had different activity log requirements for the incidents in question, and their alleged violations stemmed from different conduct

(misrepresentation vs. incompletion). The majority's entire position hangs on a nineteen-word sentence in Plaintiff's 216-page deposition, his claim that "[a]ny time you working as a police officer you have to complete an activity log when you conduct activity." (R.36-3, Strickland Dep., PID#782.) But this lone assertion doesn't create a genuine issue of material fact as to whether Officer Murdock is similarly situated to him for purposes of pretext.

Consider *Robinson*. The plaintiff in *Robinson* claimed his employer fired him for taking FMLA leave. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 528–29 (6th Cir. 2020). MGM said it terminated him for falsifying time entries. *Id.* at 529. We found that he had failed to establish pretext even though he "claimed that another employee arrived thirty-five minutes late to work the same day and was not disciplined." *Id.* at 530.

*Robinson* has several helpful parallels to this case. First, neither the Plaintiff here nor the plaintiff in *Robinson* put forward any additional evidence, beyond their own testimony, that their proposed comparators violated employer rules. *See id.* Second, in both cases, the record contains evidence that the proposed comparator was not "engaged in similar conduct." *Id.* at 531. The plaintiff in *Robinson* was fired for falsely recording his time, but his proposed comparator had only shown up late to work. *Id.* at 529, 531. And here Plaintiff falsified his activity log while Officer Murdock, if he violated any department rule, merely failed to fill his out. Ultimately, Plaintiff's claim, like the claim in *Robinson*, is "unsupported and rebutted" and therefore "insufficient to create a genuine issue of material fact sufficient to support a claim of pretext." *Id.* (citing *Bell v. Ohio State Univ.*, 351 F.3d 240, 253–54 (6th Cir. 2003)).

*Robinson* is not a one-off. In *Clark v. Walgreen Co.*, we again affirmed summary judgment to the employer on a similarly thin presentation from the plaintiff. 424 F. App'x 467, 475 (6th Cir. 2011) (per curiam). The plaintiff in *Clark* alleged that his employer fired him for taking FMLA leave. *Id.* at 468. Walgreens responded that it had fired him for making his employees complete company trainings while off the clock. *Id.* at 473. We determined that the plaintiff had failed to establish pretext because his "only evidence that other mangers engaged in similar misconduct is [plaintiff's] own testimony." *Id.* at 474. That's this case. Plaintiff's only support for the argument that his neglect of duty charge was retaliatory is that Officer Murdock had also engaged in similar conduct. Indeed, the plaintiff in *Clark* failed to clear an even lower

bar than applies here.  That opinion doesn't consider whether his proposed comparators were subject to different work rules or engaged in materially different conduct.  Plaintiff confronts both those complications.

None of *Clark*, *Robinson*, or my proposed resolution of this case falls outside our regular practice on summary judgment.  We've often held that a plaintiff's testimony, standing alone or sometimes even with weak support, is insufficient to survive summary judgment.  *See, e.g.*, *Kinnard v. Rutherford Cnty. Bd. of Educ.*, 109 F. App'x 85, 93 (6th Cir. 2004) (affirming summary judgment to employer on a Title VII retaliation claim because a plaintiff "cannot show pretext by simply asserting his personal belief"); *Chandler v. Regions Bank*, 573 F. App'x 525, 530 (6th Cir. 2014) (affirming summary judgment to employer on a Title VII retaliation claim where plaintiff's only evidence of differential treatment was "his own assertion"); *Bell*, 351 F.3d at 252–54 (affirming summary judgment to university on a § 1981 claim despite plaintiff's deposition testimony that that she had a relevant comparator); *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139–41 (6th Cir. 1993) (affirming summary judgment to employer on an ERISA claim despite plaintiff's affidavit and supportive deposition testimony from another witness where the employer countered with a letter from its benefits committee and conflicting deposition testimony).

I would thus **AFFIRM** the grant of summary judgment to the Department on Plaintiff's retaliation claim, and I respectfully dissent from that portion of the lead opinion to the extent that it would reverse.